PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    v.

BRANDON LEON BASHAM,

        *Defendant-Appellant.*

No. 05-5

Appeal from the United States District Court
for the District of South Carolina, at Florence.
Joseph F. Anderson, Jr., Chief District Judge.
(CR-02-992)

Argued: October 31, 2008

Decided: March 30, 2009

Before WILLIAMS, Chief Judge, and TRAXLER and
KING, Circuit Judges.

Affirmed by published opinion. Chief Judge Williams wrote
the opinion, in which Judge Traxler and Judge King joined.

## COUNSEL

**ARGUED:** Melissa Anne Meister, JENNER & BLOCK,
L.L.P., Washington, D.C.; Timothy Joseph Sullivan, BREN-
NAN, SULLIVAN & MCKENNA, L.L.P., Greenbelt, Mary-
land, for Appellant. Thomas Ernest Booth, UNITED STATES

DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** David W. DeBruin, Stephen L. Ascher, Kali N. Bracey, Thomas G. Pulham, Eric R. Haren, JENNER & BLOCK, L.L.P., Washington, D.C., for Appellant. William W. Wilkins, III, United States Attorney, Robert F. Daley, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina; Scott N. Schools, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

---

## OPINION

WILLIAMS, Chief Judge:

A jury sitting in the District of South Carolina sentenced Brandon Leon Basham to death for the carjacking and kidnapping resulting in the death of Alice Donovan in 2002. In this appeal, Basham raises six claims of error relating to both the guilt and penalty phases of his capital trial: (1) the district court abused its discretion in failing to grant Basham's motion for a new trial or a new sentencing proceeding after learning that the jury foreperson contacted several news media outlets during the trial; (2) the district court abused its discretion in disqualifying Basham's appointed counsel prior to trial; (3) the district court abused its discretion in admitting prior acts as "intrinsic" to the charged crimes; (4) the district court abused its discretion in its evidentiary rulings during the penalty phase; (5) the district court erred in omitting the "catchall mitigator," 18 U.S.C.A. § 3592(a)(8) (West 2000), from the special verdict form; and (6) his death sentence was rendered under "the influence of passion, prejudice, or any other arbitrary factor" in violation of 18 U.S.C.A. § 3595(c)(2)(A) (West 2000). For the following reasons, we reject Basham's contentions and affirm.

## I.

### A.

In 2002, Basham, a lifelong Kentucky resident, was serving the final years of a felony forgery conviction sentence at the Hopkins County Detention Center in Kentucky. In October of that year, Chadrick Evan Fulks became Basham's new cellmate. In early November, Fulks was charged with an additional (and serious) state offense, first degree abuse of a child aged twelve years or younger. On November 4, 2002, Basham and Fulks escaped the detention center together by scaling a wall in the recreation area and leaving the area on foot.

By the evening of November 5, Basham and Fulks reached the home of James Hawkins in nearby Hanson, Kentucky. Basham approached the dwelling, knocked on the door, and asked to use the telephone. Basham told Hawkins that his car had broken down and, after Basham made two calls, Hawkins agreed to drive him to a nearby convenience store. When Basham and Hawkins left the residence, Fulks joined them and the three men left in Hawkins's truck. The two men then told Hawkins that their vehicle was disabled in Robards, Kentucky, and they asked for a ride. During the drive, Fulks told Hawkins that the disabled vehicle was actually in Indiana and directed Hawkins to drive there. Fulks later changed the directions again; by this point, Basham was pointing a knife at Hawkins to keep him driving to their preferred destination. At some point, Fulks took the wheel, drove the truck into a field, and ordered Basham to tie Hawkins to a tree. Fulks became dissatisfied with Basham's speed in tying and eventually completed the job himself. They left Hawkins clothed in shorts, flip-flops, and a short-sleeved vest. Fifteen hours later, Hawkins freed himself and flagged a passing motorist. When interviewed by police officers later that day, Hawkins identified Basham and Fulks as the individuals who kidnapped him.

After abandoning Hawkins, Fulks and Basham drove to Portage, Indiana, to visit one of Fulks's former girlfriends, Tina Severance.[1] They abandoned Hawkins's vehicle at a hotel and walked to a trailer shared by Severance and her friend Andrea Roddy. The four then drove to a hotel in northern Indiana and stayed there for the next few days. At some point, Basham and Roddy began a consensual sexual relationship.

During their time in Indiana, Fulks asked Severance if she knew anyone from whom he could obtain firearms. Severance informed Fulks that a friend of hers, Robert Talsma, kept several firearms at his home; Severance and Roddy thereafter agreed to lure Talsma out of his house by offering to buy him breakfast. While Talsma was at breakfast with the women, Basham and Fulks entered Talsma's home and stole four firearms, a ring, and several blank checks. They then reunited with Severance and Roddy, and the four traveled in Severance's van to Sturgis, Michigan. That night, November 8, Basham and Roddy stayed at a hotel in Sturgis while Fulks and Severance drove to Goshen, Indiana, to smoke marijuana and methamphetamines with Fulks's brother, Ronnie Fulks.

That evening, two police officers began knocking on doors at the hotel where Basham and Roddy were staying in Sturgis. Basham opened his room door, saw the officers, closed the door, and cocked a .22 caliber revolver that he had stolen from Talsma. The officers ended up leaving before reaching Basham's door. Basham told Roddy, however, "I was about to shoot me a mother-f***er cop right. I was going to blow the f***ing cop away." (J.A. at 802.) The next morning, November 9, Basham and Roddy drove to a local Kmart to purchase sundries. Basham met a group of teenagers in the parking lot, and he reported to Roddy that they had some

---

[1]Tina Severance and Fulks met while Fulks was imprisoned in Indiana. Severance worked as a correctional officer at the facility where he served his sentence.

money and he wanted to kill them for it. After purchasing sundries with some of Talsma's stolen checks, Basham invited the teenagers back to the hotel room. Severance and Fulks arrived back at the hotel shortly thereafter, and the teenagers left. Fulks, Basham, Severance, and Roddy then drove Severance's van to the home of Fulks's brother, Ronnie Fulks, in Goshen, Indiana.

On November 10, 2002, the group of four drove to Piketon, Ohio, in Severance's van. Basham again used Talsma's checks to buy sundries, which Roddy later returned for cash. Basham and Fulks also bought two sets of camouflage clothing and Fulks stole a purse and cell phone from a Wal-Mart parking lot. On November 11, they drove to Kenova, West Virginia, near Huntington, and rented a hotel room. Fulks and Basham, wearing their sets of camouflage clothing, left the hotel room by themselves and did not return until the morning hours of November 12.

Samantha Burns, a nineteen-year-old Marshall University student, worked at the J.C. Penney's store in the Huntington Mall. In addition, Burns also participated in a school fundraiser by selling candy boxes, which she kept in her car. On November 11, Burns met her aunt at Penney's to purchase clothing for one of Burns's nieces; they parked in separate locations at the mall. At 9:46 p.m. that evening, Burns called her mother to say she was staying at a friend's house that night. Burns has never been seen since.

During the early morning hours of November 12, 2002, a local fire department responded to a reported explosion and fire at a rural area three miles outside of Huntington. The responding firemen found a car later identified as belonging to Burns burned out at a cemetery.

Meanwhile, Fulks and Basham returned to the hotel carrying muddy clothing, and Fulks indicated that they had stolen some money. Later that morning, the group of four checked

out of the motel and drove to South Carolina, where Fulks had lived for several years in the 1990s. Several facts emerged linking Basham and Fulks to Burns's disappearance. Roddy and Severance reported seeing mud, as well as one of Burns's candy boxes, in the van. In addition, Basham began wearing a heart-shaped ring around his neck that belonged to Samantha Burns. Basham told the women that he had stolen the candy from a girl selling it and that he had stolen the ring from a car. Roddy also found Burns's photo ID discarded with other items linking Burns to Fulks and Basham. More-over, it was later revealed that Fulks used Burns's ATM card twice on the evening of November 11 at local banks.

The evening of November 12, Fulks, Basham, Severance and Roddy arrived at a motel in Little River, South Carolina. The next day was a day of relative rest; Fulks and Basham stole several purses and wallets from unattended vehicles, went shopping, and then returned to the motel room to smoke marijuana, drink, and play cards. On November 14, the four moved to a motel in Myrtle Beach, South Carolina. Fulks and Basham left the women and drove to nearby Conway, South Carolina. Hoping to steal firearms, Fulks and Basham burglar-ized the Conway home of Sam Jordan. Carl Jordan, Sam's father, drove up to the home as Fulks and Basham were leav-ing. Fulks attempted to ram Jordan's car with Severance's van but stopped short; Basham exited the house and fired a shot at a nearby greenhouse. Fulks then fired a shot that shattered the back-window of Jordan's car. Jordan fled the area, with Fulks and Basham in pursuit, still firing. At some point, Fulks and Basham ceased their chase, abandoned Severance's van, and stole a truck, which they drove to the Wal-Mart in Con-way.

Upon arriving at the Wal-Mart, Basham approached a blue BMW sedan driven by forty-four year old Alice Donovan. Basham entered the car and forced Donovan to drive to the back of the parking lot, where Fulks waited. There, Fulks entered the driver's side of the car and drove away; at 4:03

p.m., Fulks used Donovan's ATM card to purchase gas from a service station in Shallote, North Carolina. At 4:30 p.m., Donovan called her daughter to say she was shopping and would be home late. Later that day, several men at the Bee Tree Farms Hunt Club in Winnabow, North Carolina, saw two men and a woman in a blue BMW drive to the end of a road by the lodge, turn around, and leave the area. Donovan, like Burns, was never seen again.

Basham and Fulks returned to their Myrtle Beach motel later that day and told Severance and Roddy they had to leave town because Basham shot at some police officers and Severance's van had been seized. Basham and Fulks took Donovan's BMW and began driving to West Virginia, leaving Severance and Roddy behind in Myrtle Beach. Donovan's ATM card was used in Little River, Myrtle Beach, and Raleigh, North Carolina. Meanwhile, Severance filed a (false) police report alleging that her van had been stolen.

On November 15, 2002, Fulks and Basham arrived at the home of Beth McGuffin near Huntington, West Virginia. McGuffin, a childhood friend of Fulks, agreed to let Fulks and Basham stay at her home. Fulks introduced Basham to her as "Tommy Blake." (J.A. at 1089.) Later on November 15, Fulks and Basham purchased crack cocaine to share. Basham and McGuffin also began a sexual relationship and had sexual intercourse three times over the next several days. Basham also gave McGuffin Burns's heart-shaped ring. On November 16, the three watched a news story about the disappearance of Samantha Burns. When McGuffin remarked that Burns was likely dead, Fulks stated, "[s]he is dead." (J.A. at 1127.)

At the same time, the Federal Bureau of Investigation ("FBI") was investigating the kidnapping of James Hawkins, which it believed Basham and Fulks had committed after escaping from prison. The FBI learned that the two men might be in Myrtle Beach, South Carolina, and that Severance had reported her van stolen. On November 16, the FBI and

local authorities interviewed Severance and learned that Basham and Fulks had left the area. The FBI also became aware of the disappearance of Alice Donovan and suspected that Fulks and Basham might be involved.

On Sunday, November 17, Fulks, Basham, and McGuffin smoked marijuana before Fulks and Basham left McGuffin's house, telling her they were headed to Arizona. Instead, they stopped at the Ashland Mall in Ashland, Kentucky, about 20 minutes from Huntington. Sometime that evening, in a Wal-Mart parking lot, Basham approached Deanna Francis's fifteen-year-old daughter as she entered the passenger side of their vehicle. Basham pointed a gun into the teenager's side, attempted to enter the car, and asked for directions to Green-ville, Kentucky. When Basham realized Deanna's daughter was talking on her cell phone, he said "[M]y bad, I didn't mean to scare you" and walked away. (J.A. at 1640.) Deanna immediately called the police.

Ashland Police Officer Matt Davis was approximately four blocks from the Ashland Mall when he heard the dispatch about the attempted carjacking. Davis drove to the mall, where he saw Basham, who met the description of the sus-pected carjacker. Davis exited his patrol vehicle and approached Basham; Basham immediately began to flee. As Davis chased Basham through the mall area, Basham drew his weapon and fired a shot in the air. As the chase continued, Basham drew his weapon a second time, turned, and fired at Davis, who fired three shots of his own in return. Basham eventually made his way to a rail yard on the banks of the Ohio River where he hid. Davis radioed reinforcements, which surrounded the area. More than an hour later, at approximately 9:00 p.m., Basham surrendered to police, iden-tifying himself as "Josh Rittman." (J.A. at 1244.) Police recovered a knife—later identified as belonging to Alice Don-ovan—and a crack cocaine pipe on Basham's person. Basham's pistol was recovered from a rail car several days later.

Fulks returned to McGuffin's home that evening and watched a news report on Basham's arrest. The morning of November 18, Fulks left McGuffin's residence to drive Donovan's BMW to his brother's house in Goshen, Indiana. Fulks stopped at a rest area, where an Ohio state trooper, who had ascertained that the BMW was stolen, approached him; a high-speed chase then ensued at speeds in excess of 130 miles per hour. During this chase, Fulks nearly struck another trooper before managing to evade capture. Fulks eventually arrived at his brother's home in the early morning hours of November 20. Police officers were staking out Ronnie's home, however, and when Fulks, his brother Ronnie, and Ronnie's girlfriend drove to a barn to hide the BMW, Fulks was arrested. Fulks's semen and the bodily fluids from an unidentified female were later found in the back seat of the BMW.

Back in West Virginia, investigators determined that "Josh Rittman" was actually Basham, and that he was a recent prison escapee. At 2:00 a.m. on November 19, Basham was interviewed for the first time. Basham first told investigators that he and Fulks had escaped from prison and committed several crimes along the way. Later, he admitted that they had traveled to South Carolina and kidnapped a woman in Conway, South Carolina. Basham, however, insisted that the woman was alive and with Fulks.

At 9:45 a.m. on November 19, investigators re-interviewed Basham. Basham told investigators that he and Fulks kidnapped a man after escaping from prison, and carried firearms when kidnapping Donovan. He further told investigators that they used her credit cards to obtain cash, that they had driven Donovan to Ashland, Kentucky, and that Fulks was waiting for Basham when Basham was caught. This time, Basham said he thought Donovan was dead because she was not with Basham and Fulks at the Ashland Mall. During this interview, Basham also told investigators that Fulks "got a girl" in West Virginia as well. (J.A. at 1505.)

On November 20, FBI agents interviewed Basham for seven hours. On this occasion, Basham told investigators that after they kidnapped Donovan, Fulks dropped Basham off at the hotel, drove Donovan to a resort area, raped her, tied her up, and left her. Basham also claimed that Fulks was the one who actually carjacked Donovan. Basham also clarified that when he said Fulks "got a girl" in West Virginia, that he meant they had stolen a girl's credit cards, not that they had kidnapped anyone else. (J.A. at 1530-31.) At this point, investigators believed Donovan may have been still alive. Basham drew a map of the places Fulks and Basham had been with Donovan. This map roughly corresponded with the Savannah Bluff area of Horry County, South Carolina. A two-day search of the area, however, left investigators no closer to discovering Donovan's fate.

On November 25, Basham, now represented by counsel, agreed to further aid investigators in finding Donovan's body. He drew a map, mentioned passing through a cemetery, and informed investigators that Donovan's body was left covered but unburied in the woods. Basham was unable to identify any specific landmarks to aid investigators.

On November 26, through counsel, Basham informed investigators that Samantha Burns was dead and that he and Fulks had rolled her body down an embankment and into the Guyandotte River near Huntington.

Two days later, on November 28, FBI and state investigators organized a search team to search Brunswick County, North Carolina, for Donovan's body. Basham, now represented by Cameron B. Littlejohn, Jr. and William H. Monckton, VI, accompanied the agents. During the ride, Basham saw a deer and said, "I never could kill a deer and here I have," but was cut off before finishing his sentence. (J.A. at 1560.) Later that day, Basham told the investigators that he and Fulks had driven past a park, taken Donovan's body out of the car, dragged it into the woods, and covered it. On two

occasions, Basham became emotional as he identified land-marks where he and Fulks had taken Donovan. Later, Basham told the investigators he had thrown out a Liz Claiborne purse strap at the Bee Tree Farms Cemetery. When they arrived, the local sheriff asked, "Is this where it happened?" (J.A. at 1576.) Basham responded, "This is it. It is." (J.A. at 1576.) The cemetery was searched to no avail. To date, Donovan's remains have not been identified.[2]

Starting in late November 2002, while in jail awaiting trial, Basham began writing letters to McGuffin, telling her his real name, claiming that he loved her, that he had not "hurt that girl from South Carolina" (J.A. at 1133), and that Fulks was responsible for their crime spree. On this last point, Basham wrote that Fulks "lied to me" and "told me he had all kinds of money, and a new car, and all of this stuff just waiting on him, and all he needed me to do was to show him the way away from the jail because I was raised in that area." (J.A. at 1142.) Basham was not entirely forthright with McGuffin, however, as he also wrote that Burns's ring, which he had given to McGuffin, was "not stolen or anything like that." (J.A. at 1143.) Basham also confided that he "did a lot of bad s**t with [Fulks]." (J.A. at 1146.)

On December 24, 2002, Basham called a former middle-school teacher in Madisonville, Kentucky, Clifford Jay. When Jay asked whether Basham had killed Alice Donovan, Basham replied, "Yes, Sir. We killed them." (J.A. at 1619.) Jay was surprised by the use of the term "them," because he had only heard about the Donovan killing.

---

[2]Recently, acting on information and a map provided by Fulks, authorities discovered human remains in a wooded area of Horry County, South Carolina, which they believe to be those of Alice Donovan. Tonya Root, *Horry County Family Prays Remains Bring Peace*, Myrtle Beach Sun News (January 28, 2009), http://www.myrtlebeachonline.com/news/local/story/761011.html.

### B.

On December 17, 2002, both Basham and Fulks were charged in a three-count indictment by a grand jury sitting in the District of South Carolina for carjacking resulting in death, in violation of 18 U.S.C.A. § 2119 (West 2000), kidnapping resulting in death, in violation 18 U.S.C.A. § 1201(a) (West 2000 & Supp. 2008), and interstate transportation of stolen motor vehicles, in violation of 18 U.S.C.A. § 2312 (West Supp. 2008).

A superseding indictment was later filed, alleging a total of eight counts: carjacking resulting in death, in violation of 18 U.S.C.A. § 2119 (Count 1); kidnapping resulting in death, in violation of 18 U.S.C.A. § 1201(a) (Count 2); interstate transportation of a stolen vehicle, in violation of 18 U.S.C.A. § 2312 (Count 3); conspiracy to commit carjacking, kidnapping, interstate transportation of a stolen vehicle, felon in possession of a firearm, and possession of stolen firearms, in violation of 18 U.S.C.A. § 371 (West 2000) (Count 4); conspiracy to use, carry, and possess firearms during and in relation to, and in furtherance of, crimes of violence, in violation of 18 U.S.C.A. § 924(o) (West 2000 & Supp. 2008) (Count 5); using, carrying, and possessing firearms during and in relation to, and in furtherance of, crimes of violence, in violation of 18 U.S.C.A. § 924(c) (West 2000 & Supp. 2008)(Count 6); being a felon in possession of a firearm, in violation of 18 U.S.C.A. § 922(g) (West 2000) (Count 7); and possession of stolen firearms, in violation of 18 U.S.C.A. § 922(j) (West 2000) (Count 8). Counts 1 and 2 carried with them the possibility of a death sentence.

On September 13, 2003, the Government filed a notice of intent to seek the death penalty against Basham under 18 U.S.C.A. § 3593(a) (West 2000), the Federal Death Penalty Act ("FDPA"). The Government alleged two statutory aggravating circumstances: that Basham and Fulks murdered Dono-

van for pecuniary gain, 18 U.S.C.A. § 3592(c)(8),[3] and that Donovan's death occurred during a kidnapping, 18 U.S.C.A. § 3592(c)(1). The Government alleged several non-statutory aggravators: Basham's other acts of violence from November 4, 2002, through November 18, 2002; Basham's future dangerousness to other persons, including inmates; and the impact of Basham's acts on Donovan's family. Basham's and Fulks's cases were severed for trial on January 29, 2004. Fulks pled guilty and, after a penalty phase, was sentenced to death. We affirmed his conviction and sentence on direct appeal. *United States v. Fulks*, 454 F.3d 410 (4th Cir. 2006), *cert. denied*, 127 S. Ct. 3002 (2007).

Basham's trial commenced on September 13, 2004. During the guilt phase, the Government produced testimony from eighty-nine witnesses, including Severance, Roddy, and McGuffin, as well as several of Basham's victims of related crimes: Hawkins, Jordan, Deanna Francis's daughter, and Officer Davis. Basham's post-arrest statements to the FBI were introduced, as were his statements to Clifford Jay and his letters to McGuffin. The carjacking and kidnapping of Donovan were captured on Wal-Mart surveillance videos, as were the ATM withdrawals made by Fulks with Donovan's ATM card.

During trial, Basham admitted culpability in the carjacking and kidnapping, but argued that Fulks committed Donovan's murder and was the instigator throughout the crime spree. To that end, during Basham's opening statement, counsel argued that the only "issue in controversy" was Basham's intent to commit serious bodily harm to Donovan at the time of the abduction. (J.A. at 530.) In framing this issue, Basham noted that he could not drive a car and had never been outside of Kentucky prior to the prison escape, that all of the places they visited were places from Fulks's past, and that Fulks was dominant and intelligent while Basham was more limited

---

[3]This aggravator was not submitted to the jury. (Gov't Br. at 18.)

intellectually and passive. After a thirteen-day trial, the jury convicted Basham of all eight counts in the superseding indictment.

The penalty phase began on October 12, 2004. The Government introduced the trial record as its principal evidence, but also introduced testimony from correctional officers and a female nurse regarding Basham's misconduct, drug use, and sexual misconduct towards female employees in prison. The Government also introduced testimony from Donovan's husband, daughter, and sister regarding the impact Donovan's death had on their family. Finally, the Government entered a videotape showing a courtroom scuffle between Basham and the U.S. Marshals that occurred during the guilt phase of the trial.

In mitigation, Basham offered six statutory and thirty non-statutory factors. The six statutory factors were: (1) impaired capacity; (2) duress; (3) minor participation; (4) no prior violent criminal conduct; (5) emotional disturbance; and (6) other factors. *See* 18 U.S.C.A. § 3592(a). Most of the non-statutory mitigating factors related to Basham's troubled youth and home life. In particular, Basham put forth evidence that his parents encouraged his bad behavior, forced him to steal to support their drug habits, and even introduced him to drugs. Basham was also sexually abused by one of his father's friends.

Basham also put forth mitigation evidence regarding his mental condition. Basham showed that he was diagnosed with learning disabilities at a young age and eventually placed into youth homes following his expulsion from school. Basham also put forth evidence suggesting that he had a deteriorating mental condition—to wit, Basham's IQ had declined from 100 as a youth to approximately 68 due to illegal drug abuse and other factors. Experts testifying on Basham's behalf diagnosed him as suffering from a brain impairment, multiple-cause dementia, drug-inhalant psychosis and anxiety. His psy-

chiatrist admitted under oath, however, that these problems did not contribute to his offenses or keep him from distinguishing between right and wrong.[4] Finally, Basham put forth evidence of his ability to adapt to prison life through the testimony of prison officials.

On November 2, 2004, following a sixteen-day penalty phase, Basham was sentenced to death on Counts 1 and 2. The jury first found the threshold factor that Basham intentionally engaged in an act of violence that created a grave risk of death. 18 U.S.C.A. § 3591(a)(2)(D) (West 2000). The jury further found the statutory aggravator that the death occurred during a kidnapping, as well as non-statutory aggravating factors that Basham: escaped from jail, killed Samantha Burns,[5] assaulted Carl Jordan, kidnapped and carjacked James Hawkins, attempted to murder Officer Davis, and impacted Donovan's family. The jury did not find the aggravator of future dangerousness. At least one juror found two of the six statutory mitigating factors and seventeen of the twenty non-statutory mitigating factors. The jury found four non-statutory mitigators unanimously as to either Count 1 or Count 2: family history of violence (Counts 1 and 2), parents' violence (Counts 1 and 2), that Basham's mother told him to steal (Count 1), and that Basham abused drugs (Count 1).

A sentence of 744 months imprisonment was entered on the remaining six counts. Basham's conviction and sentence of death were finally entered on February 16, 2005. Basham filed a timely notice of appeal later that same day. Basham's death sentence was authorized by the FDPA, 18 U.S.C.A.

---

[4]To rebut the testimony of Basham's experts, the Government called its own expert witness, a psychiatrist, who testified that Basham suffered from antisocial personality disorder, a learning disorder, and substance abuse problems, but did not suffer from brain damage or dementia. (J.A. at 2663-83.)

[5]Basham and Fulks subsequently pled guilty to carjacking resulting in death and were sentenced to life imprisonment for the murder of Burns. *See United States v. Fulks*, 454 F.3d 410, 416 n.1 (4th Cir 2006).

§ 3594 (West 2000). We possess jurisdiction over Basham's appeal pursuant to 28 U.S.C.A. § 1291 (West 2006) and 18 U.S.C.A. § 3595 (West 2000).

On appeal, Basham raises six contentions of error, which we address in turn.

## II.   Juror Misconduct

We first consider Basham's argument that the district court should have granted his motion for a new trial after learning that the jury foreperson contacted several news media outlets during the penalty phase of the trial. As with several other arguments raised by Basham, additional factual background is needed to put this claim in proper context.

## A.   Factual Background

The jury returned a death sentence against Basham on November 2, 2004. On November 3, Shannon Mays, a news producer from WSPA, a television station in Greenville, South Carolina, called the Assistant United States Attorney ("AUSA") in charge of the case to inform him that she had been contacted by a woman purporting to be a juror on the Basham case during the trial. The AUSA inquired further and discovered that the female juror called and asked why WSPA was not covering the trial. The woman also told the producer she believed the jury would have a difficult time reaching a decision in the penalty phase because there were several jurors for and several against the death penalty. She also informed the producer that Basham had "acted out" in court and that there were some jurors from the upstate.[6] (J.A. at 3249.)

---

[6]Greenville is located in what is considered "the upstate" region of South Carolina.

The AUSA immediately contacted the district court and defense counsel; during a November 10, 2004 status conference, the district court decided to call the female jurors from upstate South Carolina before the court. On November 12, a sealed hearing was held involving three female jurors from the upstate, as well as Shannon Mays. Mays testified that she knew of the Basham case because she covered Basham and Fulks's escape from prison when she worked for a news station in Indiana and had informed the juror of that fact during their conversation. She stated that she did not impart any other information to the juror and that the call lasted less than five minutes.

The district court, after offering them legal representation, then questioned each of the three female jurors from the upstate under oath. After consulting with counsel, the jury foreperson, Cynthia Wilson, admitted to calling not only WSPA, but also two other television stations while the trial was in progress. Wilson claimed that she made the calls in an effort to have the media do a profile piece on the dangers of shopping alone at malls. Wilson testified that none of the people she spoke with imparted any information to her, and that she did not pass along any specific information about the jury's thoughts or deliberations. Wilson further testified that the jury did not begin discussing the penalty portion of the case prior to the deliberations. Finally, Wilson testified that her husband followed the trial via the internet, but that he did not share any of his findings with her until after the trial. The other two female jurors declined the assistance of counsel, denied having contacted any media outlets, and confirmed that they had not discussed the penalty portion of the case with anyone prior to the deliberations. Neither mentioned Wilson bringing any external information to their attention.

On November 18, the district court recalled the remaining nine regular jurors for questioning under oath, and it held another hearing on November 23, 2004, to question the alternates; Wilson; and her husband, Greg Wilson. During these

hearings, none of the remaining jurors mentioned Wilson bringing any external information to their attention. One juror, Shelda Richardson, testified that she did not engage in premature deliberations, but that Wilson did, on occasion, ask her how she felt about certain issues and commented on witness testimony. Richardson testified that Wilson was an "either[/]or" person who "already had her mind made up to a certain degree." (J.A. at 2970.) Wilson testified that she had not engaged in any conversations with any juror about the facts or law of the case prior to the deliberations. Mr. Wilson confirmed that he had not discussed anything that he had found in his internet research with his wife.

On December 1, 2004, Basham moved for a new trial, a motion that the Government opposed. The district court then granted defense counsel's motion to obtain Ms. Wilson's phone records. During a December 13, 2004 hearing, the district court learned that the phone records revealed that Wilson made the calls on Friday, October 29, 2008, after the close of the evidence in the penalty phase but before the jury instructions were given and the deliberations began.

Specifically, Wilson made a six-minute call to WSPA, two one-minute calls and a four-minute call to WHNS Asheville, a two-minute call to WYFF in Greenville, a two-minute call to the Greenville News, and a one-minute call to the Spartanburg Herald. These latter two calls to newspapers had not been reported by Wilson during her initial testimony.

The district court contacted these media outlets to find anyone who remembered speaking with Wilson. WHNS responded that no one could remember speaking with Wilson; WYFF responded that an employee, Stephanie Moore, had taken a call from a female juror on the Basham case and may have said something to the caller about the case. Both newspapers ultimately were unable to produce anyone who remembered taking a call from Wilson. The district court, noting the short duration of both of those calls, surmised that Wilson,

calling on a Friday evening, most likely failed to reach anyone at the papers. Wilson was recalled to testify about these remaining contacts; she did not remember calling the newspapers. The district court also questioned Wilson about an eleven-minute call she made to another juror immediately prior to her calls to the media outlets. Wilson testified that she had simply offered that juror a landscaping job and did not discuss the case with him.

On January 14, 2005, Basham moved for further investigation after Wilson's telephone records revealed seventy-one calls between her and two other jurors from September through October 2004. Several of these calls, according to Basham, occurred at critical moments during the trial. For instance, Wilson called both jurors on the day the jury rendered its guilt-phase verdict and called one of them again the day of opening arguments in the penalty phase. In addition, the day before closing arguments in the penalty phase, Wilson spoke four times with a juror for a total of almost two hours. Basham's defense counsel conceded during an earlier hearing, however, "I looked at the record . . . [those two jurors] have been asked if they prematurely deliberated, they did not." (S.J.A. at 24.)

After holding a lengthy hearing, the district court denied the request for further investigation, finding that it credited those two jurors' statements that they did not deliberate prematurely and concluding that any further investigation would risk infringing on the jurors' privacy. As the district court explained, summarizing the breadth of its investigation "[w]e have heard from 16 jurors under oath and we have heard from Cynthia Wilson three times, and I've signed subpoenas for the defense lawyers to get dozens if not hundreds of telephone records." (J.A. at 3189.)

The district court held its ninth and final hearing on February 14, 2005, to consider Basham's motion for a new trial in full. By written order on March 14, 2005, the district court

denied the motion for a new trial.[7] The district court con-
cluded that Wilson's contact counted as an improper external
influence, triggering a presumption of prejudice under *Rem-
mer v. United States*, 347 U.S. 227 (1954) (*Remmer I*), and its
progeny. *See*, *e.g.*, *Stockton v. Virginia*, 852 F.2d 740, 743-44
(4th Cir. 1988). The district court described the situation as
follows: "This case presents a unique situation involving egre-
gious misbehavior by a juror, but no showing that she learned
anything or was influenced in any way." (J.A. at 3259.) Ulti-
mately, the district court concluded that the Government had
rebutted the presumption of prejudice because "the contact
did not involve the defendant, the government, or any wit-
nesses in the case," and Wilson "reached out to strangers to
the suit who would have had no information other than what
was available in the public arena." (J.A. at 3260.) And, "there
is no evidence that the juror informed the other members of
the jury about the phone calls." (J.A. at 3261.)

The district court rejected a similar argument by Basham
that Wilson's "flagrant[ ] violat[ion]" of the court's instruc-
tions created a due process violation and a structural error.
(J.A. at 3261.) The district court, citing *Sherman v. Smith*, 89
F.3d 1134 (4th Cir. 1996) (en banc), in which we declined an
invitation to rule that juror misconduct was a structural error,
found that "there has been no showing that the juror's actions
in this case was anything other than harmless error." (J.A. at
3262.)

### B.  Legal Analysis

We review the denial of a motion for a new trial for abuse
of discretion. *Fulks*, 454 F.3d at 431. However, in cases
involving possible improper communication with jurors, "be-

---

[7]During a separate hearing, the district court held Wilson in contempt
of court for violating its instructions not to discuss the case publicly. It
fined Wilson $2,500 and ordered her to perform 120 hours of community
service.

cause the ultimate factual determination regarding the impartiality of the jury necessarily depends on legal conclusions, it is reviewed in light of all the evidence," and therefore we apply a "somewhat narrowed" modified abuse of discretion standard that grants us "more latitude to review the trial court's conclusion in this context than in other situations." *United States v. Cheek*, 94 F.3d 136, 140 (4th Cir. 1996) (internal citation and quotation marks omitted).

The Sixth Amendment includes an impartial jury clause, such that "[p]rivate communications, possibly prejudicial, between jurors and third persons, . . . are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." *Mattox v. United States*, 146 U.S. 140, 150 (1892). "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (internal quotation marks omitted). This rule resulted in what is colloquially called the *Remmer I* presumption:

> [A]ny private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

*Remmer I*, 347 U.S. at 229.

We apply a familiar process "for analyzing allegations of extrajudicial juror contact." *Cheek*, 94 F.3d at 141. First,

"[t]he party who is attacking the verdict bears the initial burden of introducing competent evidence that the extrajudicial communications or contacts were more than innocuous interventions." *Id.* (internal quotation marks omitted). Second, upon satisfaction of this "minimal standard . . . , the *Remmer I* presumption is triggered automatically." *Id.* And, "[t]he burden then shifts to the prevailing party to prove that there exists no 'reasonable possibility that the jury's verdict was influenced by an improper communication.'" *Id.* (quoting *Stephens v. S. Atl. Canners, Inc.*, 848 F.2d 484, 488-89 (4th Cir. 1988)). This "heavy obligation" requires the court to "examine the entire picture, including the factual circumstances and the impact on the juror." *Cheek*, 94 F.3d at 142 (internal quotation marks omitted).

In determining whether a communication is innocuous, we "turn to the factors the Supreme Court deemed important." *Cheek*, 94 F.3d at 141. "These factors are: (1) any private communication; (2) any private contact; (3) any tampering; (4) directly or indirectly with a juror during trial; (5) about the matter before the jury." *Id.*

On appeal, Basham contends that the district court abused its discretion in finding that the Government met its heavy burden of rebutting prejudice, while the Government argues that it satisfied its burden. Applying our modified abuse of discretion standard, we affirm the district court's denial of the motion for a new trial.

The Government concedes that Wilson's contact with the news media outlets constituted improper external communications and triggered the *Remmer I* presumption of prejudice.[8]

---

[8]Basham contends that, given what he terms the "extraordinary confluence of juror misconduct," no showing of prejudice is required. Like the district court, we agree that "the error complained of by the defendant is not subject to structural error analysis." (J.A. at 3262.) *See Sherman v. Smith*, 89 F.3d 1134, 1139 (4th Cir. 1996) (en banc) (noting harmless error analysis has been applied to "claims of juror misconduct and bias").

Thus, we must only answer whether there exists no "reasonable possibility that the jury's verdict was influenced by an improper communication." *Id.* Courts look at a variety of factors in determining if this standard has been met, including the extent of the improper communication, the extent to which the communication was discussed and considered by the jury, the type of information communicated, the timing of the exposure, and the strength of the Government's case. *See, e.g.*, *Stockton*, 852 F.2d at 747 (considering the extent of exposure), *United States v. Lloyd*, 269 F.3d 228, 240-41 (3d Cir. 2001) (considering the timing of exposure, length of jury deliberations and structure of its verdict, and strength of Government's case); *United States v. Williams-Davis*, 90 F.3d 490, 497 (D.C. Cir. 1996) (considering the strength of Government's case, whether information gained was cumulative); *United States v. Blumeyer*, 62 F.3d 1013, 1017-18 (8th Cir. 1995) (same).

On balance, these factors indicate a lack of prejudice to Basham. First, the extent of the communication, the most important factor, was minimal; several phone calls to different media outlets, none lasting longer than six minutes. The district court found there was "no showing" that the media outlets even provided any information to Wilson. *See United States v. Sampson*, 486 F.3d 13, 41-42 (1st Cir. 2007), *cert. denied*, 128 S. Ct. 2424 (2008) (finding no prejudice where communication between juror and witness, during which juror told witness he had a good memory, was "terse, fortuitous, and devoid of substantive content"); *Blumeyer*, 62 F.3d at 1016-18 (concluding that the presumption of prejudice does not even attach unless extraneous information relates to facts under deliberation and, even assuming it did, finding no prejudice where jury foreman asked lawyer hypothetical question about issue of law); *United States v. Diez*, 736 F.2d 840, 845-46 (2d Cir. 1984) (finding no prejudice where juror asked a law enforcement officer whether he knew two witnesses in an ongoing trial). To the extent Wilson received any information, it was a statement from the WSPA news producer Shannon

Mays that she had covered the case in Indiana when Basham and Fulks escaped; such information was obviously cumulative of what the jury had already heard. In addition, the district court found "no evidence" that Wilson "informed the other members of the jury about the phone calls." (J.A. at 3261.)

We admit the timing of the communication, right before jury instructions, is troubling. *See Waldorf v. Shuta*, 3 F.3d 705, 713 (3d Cir. 1993) (noting that exposure both the night before and day of the verdict was at a very critical moment). Courts rarely find external communication prejudicial, however, where, like here, the communications are "devoid of substantive content." *Sampson*, 486 F.3d at 41. Given the district court's express finding that Wilson received no substantive information during these phone calls, we cannot say that the district court abused its discretion in denying Basham's motion for a new trial.[9]

---

[9]We likewise reject Basham's related contention that the district court failed to adequately investigate the issue of prejudice by failing to further question the jurors about the seventy-one phone calls Wilson made and whether Wilson imparted extrajudicial information during those calls or at any other time during the deliberations.

"The district court has broad discretion in choosing how to handle a claim of juror bias or misconduct." *United States v. Barnette*, 390 F.3d 775, 808 (4th Cir. 2004), *vacated on other grounds*, 546 U.S. 803 (2005). "The Fourth Circuit follows the view that the trial court may deal with [claims of juror misconduct] as it feels the particular circumstances require and only reverse for abuse of discretion." *United States v. Gravely*, 840 F.2d 1156, 1159 (4th Cir. 1988).

We find no such abuse of discretion in this case. As catalogued above, the district court conducted a searching inquiry that spanned nine hearings. More importantly, the district court found that Wilson did not receive any "knowledge" from the media outlets, (J.A. at 3260), and that there was "no evidence" that Wilson informed the other jurors of the media contacts, (J.A. at 3261). Given these factual findings, which we believe are amply supported by the record, we do not believe the district court abused its discretion in denying Basham's request for further inquiry.

In drawing this conclusion, we find relevant the First Circuit's following statement in *Sampson*:

> Here, moreover, the district court's inquiry was virtually a textbook model. The court's response was swift, its questioning pointed, and its search for any inkling of prejudice thorough. After making a face-to-face assessment of the juror's sincerity and of the possibility that other jurors had been contaminated, the court concluded that the interaction was harmless. That conclusion may not have been inevitable, but it plainly was not an abuse of discretion.

*Id.* at 42.

Likewise, the district court's inquiry here was a "textbook model." Immediately after being contacted by the AUSA, it called in the jurors potentially responsible for the communication. In total, the district court held nine hearings, subpoenaed phone records, questioned every juror and alternate, and carefully considered all the evidence concerning the communication. While, as in *Sampson*, the district court's conclusion was not necessarily "inevitable," it "plainly was not an abuse of discretion." *Sampson*, 486 F.3d at 42.

### III.   Disqualification of Appointed Counsel

Next, we consider Basham's argument that the district court should not have disqualified his appointed counsel prior to trial. We review a district court's disqualification of defense counsel for a conflict of interest for abuse of discretion. *United States v. Wheat*, 486 U.S. 153, 163 (1988).

### A.   Factual Background

We begin by presenting additional facts necessary to resolve this claim. On November 20, 2002, the Government filed a criminal complaint against Basham and Fulks in the

District of South Carolina. On November 27, 2002, the pre-
siding magistrate judge appointed Cameron Littlejohn and
William Monckton to represent Basham. On November 28,
2002, a search team consisting of Littlejohn, Monckton,
Basham, and federal and state authorities scoured Winnabow,
North Carolina, in Brunswick County, for Donovan's body.
Near the end of the day, one of the FBI agents informed
Monckton and Littlejohn that Basham would be given one
more chance to help, since his suggestions that day had thus
far failed to yield any results. After consulting with Basham,
Littlejohn returned and said, "hypothetical[ly]," that Fulks
raped Donovan in the back of the BMW, strangled her with
a leather strap from her purse, and placed her in the trunk.
(J.A. at 3295, 3397.) After driving away, Fulks became con-
cerned that she was still alive. Fulks parked the BMW,
returned to the trunk, and slit her throat. "Hypothetical[ly],"
Littlejohn continued, the leather strap was at the Bee Tree
Cemetery with Donovan's body. (J.A. at 3295.) That particu-
lar cemetery had previously been mentioned by Basham as a
possible location for Donovan. The search team returned to
the cemetery but still was unable to find Donovan's body.

   Basham and Fulks were later indicted and, on January 13,
2003, the Government moved to disqualify Littlejohn and
Monckton, over objection. The Government first argued that
Littlejohn's statements were admissible, under Federal Rule
of Evidence 801(d)(2)(D), as party admissions. The Govern-
ment also contended that Littlejohn's statements were false
because forensic testing revealed no blood in the BMW, as
there would have been if Fulks had really slit Donovan's
throat in the trunk. Thus, the Government believed Little-
john's statements would show Basham was lying when, in
other statements, he blamed Fulks for Donovan's death.[10]

---

[10]At the time the Government filed its motion to disqualify counsel,
Basham's and Fulks's cases had not yet been severed for trial, and both
Basham and Fulks had given statements implicating each other in the mur-
ders.

And, the possibility that Littlejohn would have to testify against Basham at trial created a conflict of interest requiring disqualification.

The district court appointed counsel to represent Littlejohn and Monckton and held hearings on January 15, 2003 and April 4, 2003 on the disqualification issue. At the January hearing, Littlejohn testified that the FBI agent's version of the statement was inaccurate, and that he prefaced his statements with the word "hypothetical" because "it was not a verbatim statement. It was not being offered as a statement by the defendant." (J.A. at 142.) Littlejohn testified that he made no affirmation that Fulks stabbed Donovan *in her car*, so the statement did not contradict any forensic evidence the Government possessed. Basham, meanwhile, indicated that he had a good rapport with Littlejohn and Monckton and wanted to keep them as counsel. He did indicate, however, that he had not authorized Littlejohn to tell the FBI agents what they had discussed. Finally, both Basham and Littlejohn argued that disqualifying the attorneys could wreak havoc on the relationship between defense counsel and the Government. In particular, both Basham and Littlejohn contended that discussions between the Government and defense attorneys frequently involved hypothetical statements that neither believed to be admissible in a later proceeding.

On April 9, 2003, by written order, the district court disqualified Littlejohn and Monckton "out of an abundance of caution." (J.A. at 3406.) The district court announced several reasons for its decision: that (1) because of the cost of capital litigation, it wished to avoid "expensive and cumbersome post-verdict issues" (J.A. at 3402); (2) Basham's case was in its "infancy" and removal would "work no substantial hardship" and "eliminate a thorny issue that could arise later" (J.A. at 3403); (3) the statement might be admissible at trial under several scenarios; (4) other conflicts of interest existed, because Basham argued that he never authorized Littlejohn to make the statement to the FBI agents; and (5) although

Basham currently wanted to retain Littlejohn and Monckton, it was foreseeable that if Basham was sentenced to death, he would blame those attorneys for his situation and raise their potential conflict of interest on appeal.

The district court also rejected the policy argument that defense counsel's relationship with the Government in general would be affected if counsel were unable to offer the authorities hypothetical statements during pre-trial discussions. The district court believed the circumstances of this case—a rapidly-planned and executed search for a missing person believed to possibly be alive—were atypical and that there would be no chill on the relationship between defense counsel and the Government in future cases. Ultimately, the district court ruled the Littlejohn statements inadmissible at both the guilt and penalty phases of Basham's trial.

## B.    Legal Analysis

### 1.

On appeal, Basham argues vehemently that the district court abused its discretion in disqualifying his attorneys. In *Wheat*, the Supreme Court established the general rule that "the district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Wheat*, 486 U.S. at 163. In response to concerns that the Government may attempt to "manufacture" conflicts of interest to remove able counsel, the Court responded, "trial courts are undoubtedly aware of this possibility, and must take it into consideration along with all of the other factors which inform this sort of decision." *Id.* Thus, while recognizing "a presumption in favor of petitioner's counsel of choice," the *Wheat* Court found that such a "presumption may be overcome not only by a demonstration

of actual conflict but by a showing of a *serious potential for conflict*." *Id.* at 164 (emphasis added). And, "[t]he evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court." *Id.* A district court is free to disqualify counsel even if the defendant is willing to waive a conflict of interest because of the judiciary's "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.* at 160.

Following *Wheat*, we have upheld a district court's decision to disqualify counsel who had previously represented a witness at his current client's trial, *United States v. Williams*, 81 F.3d 1321, 1324-25 (4th Cir. 1996), and reversed for abuse of discretion a district court's *failure* to disqualify counsel who had represented the prosecution's "star witness" in a prior trial, *Hoffman v. Leeke*, 903 F.2d 280, 288-90 (4th Cir. 1990). We have made clear that a district court "must have sufficiently broad discretion to rule without fear that it is setting itself up for reversal on appeal" if it disqualifies counsel. *Williams*, 81 F.3d at 1324. And, "a district court has an obligation to foresee problems over representation that might arise at trial and head them off beforehand." *United States v. Howard*, 115 F.3d 1151, 1155 (4th Cir. 1997).

2.

On balance, we cannot say that the district court abused its discretion in disqualifying Littlejohn and Monckton. Basham focuses on the fact that the district court later found the statements inadmissible, but that perspective overlooks a district court's ability to disqualify counsel in cases where the "potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Wheat*, 486 U.S. at 163. Although the district court eventually declined to admit the statements, there remained throughout the trial the possibility that Littlejohn could be called to testify. Moreover, if

Littlejohn had remained as counsel, the potential remained that Basham could later argue that Littlejohn tried the case to avoid testifying in a way that would be prejudicial to Basham. As the district court explained:

> [O]ne could imagine a scenario in which Basham could argue that the court erred by keeping the original attorneys on the case, because once they knew they were in the case to stay, Littlejohn and Monckton would attempt to marshal the evidence and try the case in such a way as to ensure that their statements could not be an issue in the case. In other words, Basham could argue that his original attorneys had a vested interest in trying the case a certain way so as to minimize the possibility, however remote, that they might be called to testify.

(J.A. at 3405.) In addition, the district court was also faced with Basham's statement that he had not authorized Littlejohn to make those disclosures to the investigators.

In sum, *Wheat* and our own precedent counsel deference to the district court in this area, particularly in anticipating potential conflicts before they come to bear. The district court held hearings, invited an expert witness to testify, and carefully considered the arguments on both sides before disqualifying Littlejohn and Monckton. In such circumstances, we cannot say that it abused its discretion.

3.

An additional reason counsels against granting Basham relief on this claim. Under the Sixth Amendment, all defendants, indigent and otherwise, have the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 684-87 (1984). Defendants with the ability to hire their own attorney also have a right to counsel of their own choosing. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 151-52

(2006). In *Gonzalez-Lopez*, the Court held that a violation of the right to counsel of choice constitutes a structural error and does not require a showing of prejudice. *Id.* Basham argues that the same result follows here; we, however, have made clear that "an indigent criminal defendant has no constitutional right to have a particular lawyer represent him." *Miller v. Smith*, 115 F.3d 1136, 1143 (4th Cir. 1997). Thus, the only right implicated by the district court's disqualification of Littlejohn and Monckton was the right to effective assistance of counsel. *See United States v. Van Anh*, 523 F.3d 43, 48 n.3 (1st Cir. 2008) (holding indigent defendants have no right to counsel of their own choosing); *Daniels v. Lafler*, 501 F.3d 735, 739 (6th Cir. 2007), *cert. denied*, 128 S. Ct. 1654 (2008) (same). As the Supreme Court noted, albeit in dicta, "those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts." *Caplin & Drysdale v. United States*, 491 U.S. 617, 624 (1989).

In *Daniels*, the Sixth Circuit addressed a similar argument and concluded that no Sixth Amendment violation occurred when, over objection, the trial judge removed a defendant's appointed counsel. The court surmised, "[t]he replacement of court-appointed counsel might violate a defendant's Sixth Amendment right to adequate representation . . . if the replacement prejudices the defendant-*e.g.*, if a court replaced a defendant's lawyer hours before trial or arbitrarily removed a skilled lawyer and replaced him with an unskilled one." *Daniels*, 501 F.3d at 740.

In this case, Littlejohn and Monckton were removed during the "infancy" of the proceeding (J.A. at 3403)—there were another sixteen months until jury selection began—and Basham's replacement counsel was Jack Swerling and Gregory Harris, two extremely experienced members of the South Carolina defense bar. Swerling, in particular, is well-known for his representation in homicide and death penalty cases. *See, e.g., Sims v. Brown*, 425 F.3d 560, 582 n. 14 (9th Cir.

2005) (noting Swerling's experience at the time included 100 homicide cases, four of which involved the death penalty). Basham does little to argue that this substitution was prejudicial, merely noting that Littlejohn and Monckton had filed a competency motion, which Swerling later withdrew, indicating that those attorneys were pursuing a different strategy than the one Swerling and Harris ultimately implemented. This sort of speculation, we believe, cannot meet the burden of showing prejudice.

In sum, Basham, as an indigent defendant, had the right to effective assistance of counsel, but not to counsel of his own choosing. He thus must point to some type of prejudice suffered because of the removal of Littlejohn and Monckton which, given the time of their removal and the replacement counsel Basham received, we do not believe he can do. Accordingly, the district court did not commit reversible error in disqualifying Littlejohn and Monckton prior to trial.

## IV.   Guilt Phase Evidence

Next, Basham contends that the district court committed reversible error in admitting certain evidence during the guilt phase. In particular, Basham argues that four categories of evidence were not admissible under Federal Rule of Evidence 404(b) and 403: (1) evidence of his drug and alcohol use and consensual sexual relationships during the crime spree; (2) evidence regarding statements Basham made threatening to kill a drug dealer, several teenagers, and two police officers; (3) evidence of Fulks's 130-mile-per hour police chase, which occurred after Basham was captured; and (4) evidence of Burns's carjacking and the attempted carjacking of Deanna Francis and her daughter.

We review evidentiary rulings of the district court for abuse of discretion.[11] *United States v. Delfino*, 510 F.3d 468, 470

---

[11]The Government contends that, except for the threats against the police officers, Basham failed to preserve an objection to this evidence.

(4th Cir. 2007), *cert. denied*, 129 S. Ct. 41 (2008). An error of law is, by definition, an abuse of discretion. *United States v. Singh*, 518 F.3d 236, 251 (4th Cir. 2008). We will not "'vacate a conviction unless we find that the district court judge acted arbitrarily or irrationally' in admitting evidence." *United States v. Benkahla*, 530 F.3d 300, 309 (4th Cir. 2008) (quoting *United States v. Ham*, 998 F.2d 1247, 1252 (4th Cir. 1993)).

Under Rule 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). Such evidence, however, may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* Furthermore, "to be admissible under Rule 404(b), evidence must be (1) relevant to an issue other than character; (2) necessary; and (3) reliable." *United States v. Siegel*, 536 F.3d 306, 317 (4th Cir. 2008), *cert. denied*, 129 S. Ct. 770 (2008) (internal quotation marks omitted). Rule 404(b) is "an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition." *United States v. Young*, 248 F.3d 260, 271-72 (4th Cir. 2001) (internal quotation marks omitted). And, "[a]s a rule of inclusion, the rule's list is not exhaustive." *United States v. Queen*, 132 F.3d 991, 994-95 (4th Cir. 1997).

The Rule 404(b) inquiry, however, applies only to evidence of other acts that are "extrinsic to the one charged." *United States v. Chin*, 83 F.3d 83, 87 (4th Cir. 1996). "[A]cts intrinsic to the alleged crime do not fall under Rule 404(b)'s limita-

Because we conclude that Basham is not entitled to relief under an abuse of discretion standard, we do not address the Government's argument that Basham must meet the more onerous plain error standard. *See*, *e.g.*, *United States v. Olano*, 507 U.S. 725, 732-34 (1993) (noting defendant's increased burden under the plain error standard); *United States v. Hughes*, 401 F.3d 540, 547-48 (4th Cir. 2005) (same).

tions on admissible evidence." *Id.* at 87-88. "Evidence of uncharged conduct is not 'other crimes' evidence subject to Rule 404 if the uncharged conduct 'arose out of the same series of transactions as the charged offense, or if [evidence of the uncharged conduct] is necessary to complete the story of the crime on trial.'" *Siegel*, 536 F.3d at 316 (quoting *United States v. Kennedy*, 32 F.3d 876, 885 (4th Cir. 1994)). *See also Chin*, 83 F.3d at 88 (noting "[o]ther criminal acts are intrinsic when they are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged" (internal quotation marks omitted)). Evidence is intrinsic if it is necessary to "provide context relevant to the criminal charges." *United States v. Cooper*, 482 F.3d 658, 663 (4th Cir. 2007).

Rule 403 provides a more limited bar to otherwise admissible evidence:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403.

"Evidence sought to be admitted under Rule 404(b) must also satisfy Rule 403's requirement." *Siegel*, 536 F.3d at 319. Under this rule, "damage to a defendant's case is not a basis for excluding probative evidence," because "[e]vidence that is highly probative invariably will be prejudicial to the defense." *United States v. Grimmond*, 137 F.3d 823, 833 (4th Cir. 1998); *see also* 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 404.21(3)(b) (Joseph M. McLaughlin, ed., 2d. Ed. 2002) (noting "[u]nfair prejudice under Rule 403 does not mean the damage to a defendant's case that results from the legitimate probative force of the evi-

dence"). Rule 403 "only requires suppression of evidence that results in unfair prejudice—prejudice that damages an opponent for reasons other than its probative value, for instance, an appeal to emotion, and only when that unfair prejudice *substantially* outweighs the probative value of the evidence." *United States v. Mohr*, 318 F.3d 613, 619-20 (4th Cir. 2003) (internal quotation marks omitted). Unfair prejudice "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

With this legal framework in place, we turn to each category of evidence contested by Basham.[12]

### A. Basham's Drug and Alcohol Use and Sexual Relationships

During its case-in-chief, the Government put forth evidence that, during their escape, Basham and Fulks frequently used drugs and alcohol, and that Basham had consensual sex with Roddy and McGuffin. No evidence was proffered, however, that Basham raped either victim—Samantha Burns or Alice Donovan.

---

[12]Basham raised an additional argument relating to the district court's evidentiary rulings: that the Government failed to provide proper notice of its intent to use Rule 404(b) evidence. Rule 404(b) requires "reasonable notice in advance of trial . . . of the general nature of any [Rule 404(b)] evidence [the government] intends to introduce at trial." Fed. R. Evid. 404(b). This argument fails because the record illustrates that Basham had sufficient notice of all of this bad acts evidence. *See United States v. Erickson*, 75 F.3d 470, 478 (9th Cir. 1996) (finding no error under Rule 404(b) notice requirement where record showed defendant had actual sufficient notice). For instance, Basham objected to admission of the threats against the police officers and the teenagers before the Government even reached that line of questioning with Tina Severance. *See* J.A. at 775 (introducing the objection by noting, "[o]ne other issue . . . I thought this may be the appropriate time to do it . . . although it will be some distance away").

We do not believe that the district court abused its discretion in admitting the evidence of Basham's relationship with McGuffin under either Rule 404(b) or 403. "Rule 404(b) does not bar evidence that completes the story of the crime or explains the relationship of parties or the circumstances surrounding a particular event." *United States v. Edwards*, 159 F.3d 1117, 1129 (8th Cir. 1998). The evidence of Basham's relationship with McGuffin served exactly that purpose—in particular, that relationship puts into context Basham's decision to give Burns's ring to McGuffin and to write inculpatory letters to her from prison.

As for evidence of Basham's relationship with Roddy and his drug use, any abuse of discretion in admitting that evidence was harmless. *See* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."); Fed. R. Evid. 103(a) (noting evidentiary errors support reversal only if they affect "substantial right"). Erroneously admitted evidence is harmless if a reviewing court is able to "say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946); *United States v. Brooks*, 111 F.3d 365, 371 (4th Cir. 1997).

While "it was detrimental to the defendants for the jury to view them as drug [users]," *United States v. Brooks*, 125 F.3d 484, 500 (7th Cir. 1997), we remain cognizant that Basham was charged with heinous actions during a crime spree following his escape from prison. Evidence that Basham used drugs and had consensual sex with Roddy was unlikely to substantially sway the jury in this case. The Government presented an overwhelming case against Basham during the guilt phase; the carjacking and kidnapping were recorded by a security camera, and Basham's counsel, during opening statement, summarized Basham's situation succinctly: "Based on what I told you, it should be fairly apparent at this point that

we will, more than likely, with all probability, have a second trial in this case. We will, more than likely, proceed into that sentencing phase." (J.A. at 531.) While an attorney's statements are not evidence, they paint a fair picture of the evidence against Basham in this case.

In addition, Basham actually used some of this evidence to his advantage. For instance, during the guilt phase, Basham focused on his lack of specific intent to kill Alice Donovan or cause her serious bodily harm. To that end, Basham repeatedly contended that Fulks was the leader during the crime spree, the driving force behind the violence. As Basham's counsel explained during closing argument, "[Fulks] was the one buying the drugs, doling out the money . . . bringing drugs back, and telling everybody how much they could have." (J.A. at 1746.) The admission of this evidence was harmless to Basham.

## B.   Basham's Threats of Violence

Next, Basham objects to the admission of his statements in the hotel room in Sturgis, Michigan, that he was prepared to kill the two police officers who were knocking on hotel room doors, his statements that he was going to rob and kill the group of teenagers at the mall there because they had money, and a statement he made to McGuffin that he was going to kill her brother, who was selling drugs to Fulks. The Government contends, and we agree, that these statements were admissible under Rule 404(b)'s "other purposes" trigger, that is, that they were relevant to Basham's intent.

Basham's specific intent to kill Donovan or cause her serious harm was the crucial issue at trial;[13] Basham admitted to carjacking and kidnapping Donovan during his opening state-

---

[13]Indeed, during the deliberations the jury actually asked the district court for a definition of intent, (J.A. at 1765-67), further suggesting that Basham's guilt turned on this element of the offense.

ment and contended only that he lacked that specific intent. Statements made after Basham's escape that he was willing to kill, without Fulks present, are thus clearly relevant to show Basham was capable of having the specific intent to do harm. *See United States v. Higgs*, 353 F.3d 281, 312 (4th Cir. 2003) (death threats admissible to prove motive and intent); *United States v. Abraham*, 386 F.3d 1033, 1035 (11th Cir. 2004) (prior threats of violence admissible to prove motive, intent, or lack of mistake). For these same reasons, the district court did not abuse its discretion in declining to exclude these statements under Rule 403 because, although undoubtedly prejudicial, they were highly probative of Basham's ability to form the specific intent to cause serious harm.

## C.   Fulks's High Speed Police Chase

Count 4 alleged a conspiracy between Basham and Fulks to, among other aims, transport stolen cars in interstate commerce. Overt acts 19 and 20 related to Fulks's efforts to hide Donovan's BMW at his brother's home in Indiana following Basham's capture. Evidence of Fulks's flight through the state of Ohio was thus arguably intrinsic to proving this conspiracy and those particular overt acts. Even intrinsic evidence, however, must also satisfy Rule 403's balancing test, *Grimmond*, 137 F.3d at 832, and, as Basham notes, the Government introduced this evidence via videotape of the chase itself.

Admission of this evidence, even if erroneous, however, was harmless. The tape represented a minor portion of the Government's lengthy presentation and showed Fulks's recklessness and desire to avoid capture, not Basham's. The Government presented overwhelming evidence of Basham's guilt, and we can confidently state that admission of this tape did not substantially sway the jury's verdict.

## D.   The Burns Carjacking and Francis Attempted Carjacking

Basham's fourth contention is that the district court permissibly admitted (1) evidence that Basham and Fulks carjacked,

kidnapped, and murdered Burns, and (2) evidence that Basham attempted to carjack Deanna Francis and her daughter, but that the district court impermissibly let the Government use this evidence in its closing argument not to prove intent under Rule 404(b), but to prove propensity. Basham did not object to the Government's closing argument, so our review is for plain error. *United States v. Fields*, 483 F.3d 313, 340 (8th Cir. 2007), *cert. denied*, 128 S. Ct. 1065 (2008). Under plain error review, Basham must show that (1) the district court committed an error; (2) the error was plain; and (3) the error affected his substantial rights. *United States v. Olano*, 507 U.S. 725, 732-34 (1993); *United States v. Hughes*, 401 F.3d 540, 547-48 (4th Cir. 2005). Even if Basham makes this showing, we notice the error only if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Hughes*, 401 F.3d at 555 (internal quotation marks and citation omitted).

We find no error, let alone plain error, on this claim. The Government referred to both incidents in its closing arguments during a list of incidents showing that Basham possessed "intent to harm, and threat[en], and cause serious bodily harm and death." (J.A. at 1728-29.) It discussed the Burns and Francis incidents as follows:

> What evidence do you have? Ladies and gentlemen, you have got Alice Donovan sandwiched in between Samantha Burns and Andrea Francis. Similarities are unbelievable. You got Brandon Basham participating, going to a mall just like with Alice Donovan, with Samantha Burns, abducting a lone female, killing her, and disposing of her body three days before Alice Donovan. And three days after Alice Donovan, you got Brandon Basham going to a mall, picking out an isolated female and trying to carjack and kidnap her. So, three days before and three days after Alice Donovan, you got Brandon Basham acting with the same, similar intent with the same, similar

> motivation. Samantha Burns is dead. Andrea Fran-
> cis, they weren't able to get her.

(J.A. at 1728.)

Basham takes isolated statements from this argument to suggest that the Government was contending that Basham should be found guilty of killing Donovan because he murdered Samantha Burns and attempted to carjack the Francis family. Such an argument, Basham notes, would be forbidden by Rule 404(b)'s admonition that other act evidence is not usable "to prove the character of a person to prove conformity there with." Fed. R. Evid. 404(b). A full examination of this closing argument, however, reveals that the Government tied this evidence entirely to a discussion of Basham's intent. Accordingly, there was no error, let alone plain error, in allowing the Government's closing argument on this point.

## E.   Cumulative Error

Basham's final contention is that, even if the improperly admitted evidence, when viewed individually, is harmless, that result changes when the evidence is viewed cumulatively. Pursuant to the cumulative error doctrine, "[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990) *cited with approval in United States v. Martinez*, 277 F.3d 517, 532 (4th Cir. 2002). Generally, however, if a court "determine[s] . . . that none of [a defendant's] claims warrant reversal individually," it will "decline to employ the unusual remedy of reversing for cumulative error." *Fields*, 483 F.3d at 362. To satisfy this requirement, such errors must "so fatally infect the trial that they violated the trial's fundamental fairness." *United States v. Bell*, 367 F.3d 452, 471 (5th Cir. 2004). When "none of [the] individual rulings work[ ] any cognizable harm, . . . [i]t necessarily fol-

lows that the cumulative error doctrine finds no foothold." *Sampson*, 486 F.3d at 51.

In the instant case, given the overwhelming evidence against Basham, and the fact that neither the admission of Basham's drug use nor the admission of Fulks's car chase "individual[ly] work[ ] any cognizable harm" and were mere blips in a presentation that included eighty-nine witnesses and countless exhibits, we have little difficulty concluding that cumulatively there is no error. *Id.*

## V.   Penalty Phase Evidence

Basham next raises several contentions regarding the admissibility of certain evidence during the penalty phase of the trial. In particular, Basham contends that the district court should not have admitted: (1) evidence of his behavior toward female prison employees; (2) evidence of a scuffle in the courtroom between him and the United States Marshals; and (3) the trial record itself. Basham also contends that the district court should have admitted as evidence that, in Fulks's trial, the Government referred to Basham as Fulks's "puppet." Basham failed to raise a timely objection to the latter two rulings.

We review evidentiary rulings for abuse of discretion. *Delfino*, 510 F.3d at 470. We have held that this standard of review is equally applicable to evidentiary rulings made at the penalty phase. *Fulks*, 454 F.3d at 434. By statute, however, at the penalty phase, if evidence was erroneously admitted, reversal is mandated unless the Government can show beyond a reasonable doubt that the error was harmless. *United States v. Barnette*, 211 F.3d 803, 824 (4th Cir. 2000); 18 U.S.C.A. § 3595(c)(2)(C) (noting, for "any other legal error requiring reversal . . . that was properly preserved . . . [t]he court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless"). Basham's unpreserved claims are reviewed for plain error.

In federal capital sentencing hearings, the Federal Rules of Evidence do not apply. Instead, 18 U.S.C.A. § 3593(c) (West 2000 & Supp. 2008) provides:

> Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

18 U.S.C.A. § 3593(c).

That section also provides that the Government "may present any information relevant to an aggravating factor for which notice has been provided" and that a defendant "may present any information relevant to a mitigating factor." *Id.* Moreover, "[i]nformation presented may include the trial transcript and exhibits if the hearing is held by a jury or judge not present during the trial, or at the trial judge's discretion." *Id.* Courts have noted that the FDPA "erects very low barriers" of admissibility given that "the need to regulate the scope of testimony is less at the penalty phase than at the guilt phase." *United States v. Lee*, 274 F.3d 485, 494 (8th Cir. 2001). With this statutory framework in place, we turn to each of Basham's claims.

### A. Basham's Behavior Toward Female Prison Employees

The Government's death notice against Basham listed "future dangerousness" as a non-statutory aggravating circumstance. Future dangerousness is best defined as evidence that a defendant is "likely to commit criminal acts of violence in the future that would be a threat to the lives and safety of others." *United States v. Bernard*, 299 F.3d 467, 482 (5th Cir. 2002). The Supreme Court has recognized future dangerousness as a legitimate aggravating factor in capital proceedings. *Simmons v. South Carolina*, 512 U.S. 154, 162-63 (1994). At

the penalty phase, the Government sought to introduce evidence that Basham's behavior in correctional facilities and his behavior toward female prison employees indicated a failure to adapt to societal norms and suggested his future dangerousness towards inmates and correctional employees. To that end, during the penalty phase, the Government introduced evidence that Basham, while imprisoned prior to trial, hoarded medicine, fought with guards, broke prison rules, and brought in contraband. Basham did not object to this evidence.

The Government next entered testimony, over Basham's objection, that Basham exposed himself and masturbated in front of female nurses delivering medicine. Likewise, a male guard testified that, when, at the nurses' request, he confronted Basham regarding the behavior, Basham smiled and said he was just playing around with the women. The experiences of one particular nurse, Jennifer Miosi, are representative. Nurse Miosi testified that, on one occasion, Basham masturbated when Miosi was speaking with him, ignored requests to stop, and ejaculated in her direction. On other occasions, Basham asked her to stay and watch him finish masturbating. He once stuck his erect penis and genitals through the food slot of his cell and ejaculated at her. He also threatened to sodomize her during an incident involving a telephone. Basham had been given a headset to make a phone call from his cell but refused to give it back and began threatening the staff that he was going to "use it to bash people's heads in." (J.A. at 2036.) Nurse Miosi attempted to de-escalate the situation, to which Basham responded by threatening her, "I am going to f**k you up the a**, Ms. Miosi. I am going to kill you, psych b***h." (J.A. at 2038.)

We do not believe the district court abused its discretion in admitting this evidence. First, under § 3593(c), the Government may introduce "any information relevant to an aggravating factor for which notice has been provided." This evidence is clearly "relevant" to the future dangerousness aggravator.

Relevance "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. "[R]elevance typically presents a low barrier to admissibility." *United States v. Leftenant*, 341 F.3d 338, 346 (4th Cir. 2003). Thus, evidence is relevant if it is "worth consideration by the jury" or has a "plus value." *Queen*, 132 F.3d at 998 (internal quotation marks omitted). Evidence that Basham, while a prisoner, engaged in sexually aggressive and threatening behavior towards female employees clears that minimal hurdle as to his future dangerousness. *See, e.g.*, *United States v. LeCroy*, 441 F.3d 914, 930 (11th Cir. 2006) (concluding that evidence of prior crimes was "clearly probative" to defendant's future dangerousness); *Bernard*, 299 F.3d at 482 (concluding that evidence of propensity for violence in prison permitted finding of future dangerousness); *Lee*, 274 F.3d at 494 (holding that evidence defendant abused a girlfriend, assaulted his sister, and assaulted patients and inmates at facilities probative of future dangerousness).

Second, we do not believe the district court abused its discretion in concluding that the probative value of the evidence was not outweighed by the risk of unfair prejudice. We do appreciate the fact that the female employees were not particularly concerned by Basham's display; for instance, one nurse testified that she chose not to report Basham for his behavior, and Nurse Miosi testified she "didn't feel as though [she] was in danger of him trying to grab . . . or hit . . . [her] hands" during the foot slot incident (J.A. at 2031), and that "the thing is, I can walk away from his cell. He can't follow me." (J.A. at 2050.) This testimony in and of itself, however, would seem to eliminate much of the concern of unfair prejudice Basham raises. Moreover, given the heinousness of the acts committed by Basham during his escape, we find it unlikely that this evidence would particularly inflame the jury. *See Lee*, 274 F.3d at 494 (finding unfair prejudice did not outweigh probative value of future dangerousness evidence because "none of the

evidence elicited . . . was likely to inflame the jury as much as testimony about [the defendant's] involvement in the murder"). Indeed, Basham's counsel, during the guilt phase, noted that the criminal acts committed by Basham were "despicable" and would "shock" the jury. (J.A. at 524, 523.)

Basham contends, however, that the risk of unfair prejudice from the evidence regarding his sexually threatening behavior was elevated because the Government had posited that Fulks—but not Basham—raped Donovan prior to her death. Thus, argues Basham, evidence of his sexually inappropriate behavior toward the female prison employees might have led the jury to associate him with those rapes as well. We disagree; any such minimal risk is offset by the highly probative nature of this evidence and the fact that this evidence was no more likely to inflame the jury than the testimony of the heinous acts committed by Basham in November 2002.

## B.   The Courtroom Scuffle

During the guilt phase of the trial, it came to the district court's attention that Basham was having trouble staying awake in court. Basham informed the court that he was unable to stay awake by the afternoon because he was emotionally exhausted and stressed out; he then became emotional, saying he simply wanted to sign the death warrant and be executed. As a less drastic measure, the district court agreed to let Basham, in exchange for staying awake, use chewing tobacco in court.

The following Monday, the district court withdrew this promise on the advice of the United States Marshal. The Marshal informed the court that Basham had a history of flinging fluids—bodily and otherwise—at correctional officers, and the Marshal was concerned about what Basham might do with the spit created by chewing tobacco. As a compromise, the district court offered Basham nicotine gum and Mountain Dew, or a similarly caffeinated beverage. Later, outside the

presence of the jury, the district court addressed a report that Basham had told another marshal that he did not actually care about having the chewing tobacco, but that he just wanted to make U.S. Deputy Marshal Riley, an African-American, mad. During this discussion, Basham became agitated and asked to go downstairs to a holding cell to watch the proceedings. After the district court informed Basham that would not be possible because Basham's counsel had previously indicated opposition to him leaving the courtroom, Basham refused to comply with the district court's instruction to take his seat. Marshals approached Basham to assist him to his seat, prompting Basham to say, "Let me go, like I said. You mother f***ers." (J.A. at 1156.) The trial transcript continues, "[w]hereupon a tussle ensued in the courtroom between the defendant and the marshals." (J.A. at 1156.)

Basham kept a running commentary during the "tussle," swearing at the marshals, saying "[t]he f***ing judge lied to me," (J.A. at 1157), claiming that he never said anything to Deputy Marshal Riley, and that "It is all because that Riley is black. It is racism is all it was." (J.A. at 1158.) Basham then noted, "And another thing. You talking about spitting. If I was going to spit, I would be spitting now." (J.A. at 1158.)

Once the situation was controlled, Basham was sent downstairs to the holding cell. The trial was adjourned for that afternoon. Thereafter, the district court permitted Basham to have dip during breaks, and Basham behaved himself. During the penalty phase, over Basham's objection, the Government moved to introduce the transcript and videotape of the scuffle. The district court obliged, but removed all references to himself (i.e. the threat "the f***ing judge lied") and to Basham's beliefs that the confrontation was spurred by racism. The district court was concerned that putting those details before the jury could cause it to punish Basham for threatening the judge or being racially insensitive instead of for the crimes charged.

Again, like the evidence of Basham's sexual misconduct towards the female prison employees, this evidence was

clearly relevant to Basham's future dangerousness—it proved his confrontational nature toward authority figures, particularly prison officials. It was also probative as rebuttal to one of Basham's principal mitigation arguments—that Basham suffered from various mental defects limiting his culpability. Basham's actions and manipulation during the episode (saying he would have spit during the fight if he was someone who did spit), coupled with the fact that he remained calm during the remainder of the trial once he was permitted to have his chewing tobacco during breaks, point to a manipulative individual.

Moreover, the district court substantially diminished any risk of unfair prejudice by excising Basham's comments about racism and the district court. In these circumstances, we cannot say the district court abused its discretion in admitting this evidence.

## C.    The Trial Transcript

Basham failed to raise a contemporaneous objection to the admission of the trial transcript during the penalty phase.[14] Accordingly, we review this claim for plain error. *Chin*, 83 F.3d at 87. Under plain error review, Basham must show that (1) the district court committed an error; (2) the error was plain; and (3) the error affected his substantial rights, i.e., that the error affected the outcome of the penalty phase. *Olano*, 507 U.S. at 732-34; *Hughes*, 401 F.3d at 547-48. Even if Basham makes this showing, we notice the error only if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Hughes*, 401 F.3d at 555 (internal quotation marks and citation omitted).

Section 3593(c) provides that "[i]nformation" during the

[14]Basham contends that he did raise such an objection, but a review of the record shows that Basham simply asked the district court to include all of his objections to trial testimony in admitting the record.

penalty phase "may include the trial transcript and exhibits if the hearing is held before a jury or judge not present during the trial, or at the trial judge's discretion." 18 U.S.C.A. § 3593(c). Thus, the language of the FDPA clearly rests the decision to admit the trial record firmly in the district court's discretion. Common sense would dictate that, given that the same jury is presumed to hear both the guilt and penalty phases, *see* 18 U.S.C.A. § 3593(b), the trial record is almost always going to be considered during the penalty phase. *Cf. United States v. Ortiz*, 315 F.3d 873, 902 (8th Cir. 2002) (noting "the government permissibly relied on evidence introduced at trial" to prove an aggravating factor during the guilt phase).

Section 3593(c), however, sets forth a different evidentiary standard than the Federal Rules of Evidence provide at trial. Thus, "a court has two separate sets of responsibilities with respect to evidence that a single jury may consider twice, once when deciding between guilt and acquittal, the other when deciding between life and death." *United States v. Pepin*, 514 F.3d 193, 207 (2d Cir. 2008). To that end, courts have found reversible error when a district court applies the Federal Rules of Evidence to keep evidence out during the penalty phase. *Lee*, 274 F.3d at 495. Such a rule does not, however, suggest that the FDPA's evidentiary rules operate to keep out a great deal of relevant evidence. Instead, the Supreme Court itself recognized it is "desirable for the jury to have as much information before it as possible when it makes the sentencing decision." *Gregg v. Georgia*, 428 U.S. 153, 204 (1976).

In this case, we do not believe that the district court committed plain error in admitting the trial record. Basham's main objection is to the admission of the evidence of Basham's drug use and sexual encounters during the crime spree; however this evidence was highly probative of several of the Government's aggravating factors, namely, Basham's intent in killing Donovan, his lack of remorse, *see Ortiz*, 315 F.3d at

902 (evidence that defendant went drinking after being paid for murder-for-hire showed lack of remorse); *Jackson v. Johnson*, 194 F.3d 641, 652 (5th Cir. 1999) (finding that evidence that defendant played pool and drank beer was relevant to show a lack of remorse), and his future dangerousness. And, given that the jury had already heard all of this evidence, it is somewhat difficult to understand how prejudicial its admission in the form of the trial record could be.[15]

## D.   Inconsistent Statements During Fulks's Trial

Finally, Basham argues that the district court should have admitted statements made by the Government during Fulks's trial that suggested Basham was merely Fulks's "puppet" during their crime spree. Basham concedes that he did not raise this claim below. A review of the record, however, convinces us that plain error review is not even available on this claim.

Prior to trial, Basham moved to enter—as evidence at the penalty phase—the Government's statements in Fulks's case about Basham's role in the offense. The district court stated that it would defer ruling on the motion until the Government presented its case in chief. Basham's attorney responded "that works for us" (J.A. at 511), but thereafter never moved for admission of those statements. By failing to request that the district court rule on the admissibility of that evidence, Basham has waived this argument. *See United States v. Jack-*

---

[15]For similar reasons, we also reject Basham's related contention that, even if the record was properly admitted, the Government impermissibly used the testimony regarding Basham's drug use and sexual encounters during closing arguments and elsewhere as propensity evidence. To the extent the Government did make such arguments during the closing argument, there was no plain error because that evidence was relevant to aggravating factors. Moreover, the district court properly instructed the jury that closing arguments were not evidence, (J.A. at 1908), and we presume the jury follows instructions, *Jones v. United States*, 527 U.S. 373, 394 (1999) ("The jurors are presumed to have followed . . . [the] instructions.").

*son*, 346 F.3d 22, 24 (2d Cir. 2003) ("Where . . . a claim has been waived through explicit abandonment, rather than forfeited through failure to object, plain error review is not available."). It would be difficult to see how the district court committed plain error when it never even issued a ruling to be found in error.[16]

## VI.   Jury Instructions

We review *de novo* the question of whether a mitigator was properly submitted to the jury during the penalty phase. *Higgs*, 353 F.3d at 328. Under 18 U.S.C.A. § 3592(a), "[i]n determining whether a sentence of death is to be imposed on a defendant, the finder of fact shall consider any mitigating factor." Section 3592(a)(1-7) lists seven particular mitigating factors; subsection (a)(8) is a catchall, which permits the jury to find, as a mitigating factor, "[o]ther factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence." 18 U.S.C.A. § 3592(a)(8).

Prior to issuing the jury instructions during the penalty phase in this case, the district court announced, over Basham's objection, that it would issue an instruction on § (a)(8) but would not include it on the special verdict form because of its "catchall" nature. (J.A. at 2738-41.) In its actual instructions, the district court informed the jury that Basham raised six statutory mitigating factors:

> Number Six, any other factors in Brandon Leon Basham's background, record, or character, or any other circumstance of the offense that mitigates it against the imposition of the death sentence.

---

[16]Basham also contends that the cumulative error doctrine applies to these claims. Because we conclude that the district court did not commit error in its evidentiary rulings during the penalty phase, it follows *a fortiori* that there was no cumulative error.

(J.A. at 2751.)

In its final discussion of mitigating factors, the district court reiterated:

> Unlike aggravating factors, the law does not limit your consideration of mitigating factors to those that are listed for you; therefore, if there are any mitigating factors not listed in these instructions, but which any juror finds to be established by a preponderance of the evidence, that juror is free to consider them in his or her sentencing decision.

(J.A. at 2755.)

Later during the instructions, the district court instructed the jury on the special verdict form:

> I have prepared a form entitled 'Special Verdict Form' to assist you during deliberations. You are required to record your decisions on this form . . . it will be necessary for you to record the number of jurors, if any, who found each mitigating factor. For a jury's determination to be tallied on the verdict form in this fashion requires that the juror individually go through the two-step process.

(J.A. at 2760-61, 2749)

The district court reiterated, "on the special verdict form in Section 5, you should report the total number of jurors who found that any particular factor was established by a preponderance of the evidence, and that the factor was also mitigating." (J.A. at 2750.) As mentioned, however, while the district court instructed that the jury could consider any "other factors," (J.A. at 2751), there was no space on the special verdict form to record any such factor. The district court, however, clearly explained this omission to the jury:

[W]hen I was going through these statutory mitigating factors, I listed six. The sixth was kind of a catchall factor that is not listed on this verdict form. The sixth one that I read to you said, any other factors in Brandon Basham's background, record, character, or any other circumstance of the offense that mitigates the sentence of life against the imposition of the death sentence. Since that is overall, I have not listed it on the finding form because it would be impossible to list an infinite number of mitigating factors. But I want to remind you that you are not limited to this list of mitigating factors. If any individual juror can think of a factor that is mitigating that has been proven in this case, you may consider that factor in the weighing process, regardless of whether it is in this list or not, and regardless of whether any other juror found that mitigating factor to exist.

(J.A. at 2769.)

The Eighth Amendment requires that the jury "not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record or any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality). That is, "the jury [must] be able to 'consider and give effect to [a defendant's mitigating] evidence in imposing sentence.'" *Penry v. Johnson*, 532 U.S. 782, 797 (2001) ("*Penry II*") (quoting *Penry v. Lynbaugh*, 492 U.S. 302, 319 (1989) ("*Penry I*"), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002)). Only if this standard is met can a court be sure that the jury "has treated the defendant as a uniquely individual human bein[g] and has made a reliable determination that death is the appropriate sentence." *Penry I*, 492 U.S. at 319 (internal quotation marks omitted).

"Neither the FDPA nor [the Constitution] require a capital jury to give mitigating effect or weight to any particular evi-

dence." *United States v. Paul*, 217 F.3d 989, 999 (8th Cir. 2000); *see also Higgs*, 353 F.3d at 327 (noting that "the Constitution only requires that the jury be allowed to *consider* evidence that is proffered as mitigating . . . [t]here is no constitutional requirement that the jury find a mitigating factor"). Thus, "[t]here is only a constitutional violation if there exists a reasonable likelihood that the jurors believed themselves precluded from considering relevant mitigating evidence." *Id. See Boyde v. California*, 494 U.S. 370, 380 (1990) (setting forth "reasonable likelihood" test). A jury need only "be able to consider in some manner all of a defendant's relevant mitigating evidence," and need not "be able to give effect to mitigating evidence in every conceivable manner in which the evidence might be relevant." *Johnson v. Texas*, 509 U.S. 350, 372 (1993). The government's capital sentencing procedures "may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998).

Basham contends that, although the district court's oral jury instruction may have properly informed the jurors that they could consider any "other factors" in mitigation, the absence of such a mitigator from the special verdict form created a reasonable likelihood that jurors, in fact, believed they were precluded from considering "other factors" in mitigation.

We disagree.[17] In *Jones v. United States*, 527 U.S. 373, 393 (1999), the Court rejected a similar argument, concluding that a district court's "explicit instruction" could overcome any ambiguity or confusion caused by a verdict form. Likewise,

---

[17]We also note that at least two courts have held—under the FDPA—that jurors do not have to be permitted to even record mitigating factors on a special verdict form. *United States v. Paul*, 217 F.3d 989, 999 n.6 (8th Cir. 2000); *United States v. Hall*, 152 F.3d 381, 413 (5th Cir. 1998) *abrogated on other grounds by United States v. Martinez-Salazar*, 528 U.S. 304 (2000).

in this case the district court explicitly instructed that "other factors" (J.A. at 2751) could be considered as a statutory mitigator, and even summarized its mitigation instruction to reiterate that "any mitigating factors," even those unmentioned by the parties or absent from the special verdict form, could be considered by a juror. (J.A. at 2755.)

Basham primarily relies upon the Court's decision in *Mills v. Maryland*, 486 U.S. 367 (1988). In *Mills*, the state trial judge issued an instruction that, when read in conjunction with the verdict form, arguably required the jury to find mitigating circumstances unanimously before they could be considered in determining if a death sentence was appropriate. The Court set aside the death sentence, finding a "substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Id.* at 384. We have since explained that *Mills* covers claims beyond the unanimity requirement, that is, claims that ambiguous verdict forms may create "confusion precluding the jury from considering mitigating evidence." *Burch v. Corcoran*, 273 F.3d 577, 587 (4th Cir. 2001).

*Mills* is inapplicable to the present case; the district court, correctly and concisely, instructed the jury that it was free to consider any factor in mitigation, including factors not specifically raised. That was in addition to the district court's recitation of five other statutory mitigating factors and thirty nonstatutory mitigating factors. And, when explaining the special verdict form, the district court reiterated, in clear language, that a juror could consider any mitigating factor it desired, even if it did not appear on the form. This case is a far cry from *Mills*, in which the jury instructions suggested no mitigating factors could be considered unless the jury unanimously so found. Indeed, the underlying current in this line of Supreme Court precedent is confusion in the oral jury instruc-

tion itself. *See, e.g.*, *Penry II*, 532 U.S. at 798 (in reversing death sentence, Court noted the mitigating instruction was a "confusing instruction" that made it "logically and ethically impossible for a juror to follow both sets of instructions").

Basham's argument also runs into the "strong policy against retrials . . . where the claimed error amounts to no more than speculation." *Boyde*, 494 U.S. at 380. "[A] capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility [that the jury applied a challenged instruction in a way that prevented the consideration of mitigating evidence]." *Id.* We conclude there is no such possibility in this case, and the omission of the "other factors" mitigator from a special verdict form listing thirty-six statutory and non-statutory mitigating factors does not raise a "reasonable likelihood" that mitigating evidence was withheld from the jury.

## VII.  Section 3595

Section 3595 of the FDPA states that "[t]he court of appeals . . . shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor." 18 U.S.C.A. § 3595(c)(1). Accordingly, we are "obliged" to review the entire record independently even if the defendant does not raise the issue. *Fulks*, 454 F.3d at 421 n.4.

Courts, including our own, have looked at several factors in determining if a death sentence was imposed under an improper influence, such as the following: whether the jury was instructed not to rely on an arbitrary factor, *Fields*, 483 F.3d at 362 n.42, whether sufficient evidence supported the aggravating factors, *Barnette*, 211 F.3d at 820-21; *Paul*, 217 F.3d at 1017, whether the jury's verdict indicates that it considered the evidence dispassionately, *Sampson*, 486 F.3d at 51-52, and whether the trial was conducted fairly, *Fulks*, 454 F.3d at 421 n.4. We will vacate a death sentence when an

arbitrary factor "most likely" influenced the sentence. *United States v. Agofsky*, 458 F.3d 369, 373 (5th Cir. 2006); *United States v. Johnson*, 223 F.3d 665, 676 (7th Cir. 2000).

With these factors in mind, we conclude that Basham's sentence was not rendered under the influence of passion, prejudice, or another arbitrary factor. First, and most importantly, the jury's verdict indicates that it followed its instructions and weighed the evidence dispassionately: it rejected one of the Government's aggravators (future dangerousness), and at least one juror found nineteen of Basham's thirty-six statutory and non-statutory mitigators. *See Sampson*, 486 F.3d at 52 (finding no arbitrariness when "the jurors failed to find other aggravating factors . . . [and] the jurors found several mitigating factors"). This verdict "suggest[s] that the jury considered the evidence in a thorough, even-handed, and dispassionate manner." *Id.*

In addition, the district court properly instructed the jury to not rely on arbitrary factors, and the Government had significant evidence supporting several of its aggravators, that: Basham was an escapee, killed Burns, committed acts of violence towards James Hawkins, Carl Jordan, and Officer Davis, and impacted Donovan's family. *See Paul*, 217 F.3d at 1005 ("In light of the substantial evidence supporting the aggravating factors found by the jury, we cannot say that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.").

Basham's chief argument on this issue is that, given the misconduct of Cynthia Wilson (the jury foreperson), it is naive to believe that this jury was capable of following instructions or weighing the evidence. Certainly, Cynthia Wilson was not a model juror in any way, shape, or form, and we applaud the district court's decision to sanction her for her behavior. But the jury's actual verdict, which is the best evidence of the jury's internal thought process, illustrates that the jury did carefully consider the evidence presented both in

aggravation and mitigation of Basham's crimes. *See Paul*, 217 F.3d at 1004-05 (finding no arbitrariness when jury followed "exactly the process [it] was to complete").

Accordingly, we conclude that Basham's sentence was permissible under § 3595.

## VIII.    Conclusion

"[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986). Brandon Basham's capital trial may not have been a perfect one, but a review of the proceedings below and the district court's cautious and thorough handling of them convinces us that he did receive a fair one. The judgment of the district court is

*AFFIRMED*.