Karen Taylor **BAGHERI**, Administrator of the Estate of Shawn Matthew McKee, deceased, Plaintiff-Appellee,

v.

Dwight L. **BAILEY**, M.D.; Appalachian Emergency Physicians, Defendants-Appellants,

and

Family Health Care Associates of Southwest Virginia, PC, Defendant.

No. 16-1712

United States Court of Appeals, Fourth Circuit.

Argued: September 13, 2017

Decided: October 25, 2017

ARGUED: Frank Kenneth Friedman, WOODS ROGERS, PLC, Roanoke, Virginia, for Appellants. Monica Taylor Monday, GENTRY LOCKE, Roanoke, Virginia, for Appellee. ON BRIEF: Michael P. Gardner, WOODS ROGERS, PLC, Roanoke, Virginia; James N.L. Humphreys, Jimmie C. Miller, HUNTER SMITH DAVIS, LLP, Kingsport, Tennessee, for Appellants.

Before KING and THACKER, Circuit Judges, and John A. GIBNEY, Jr., District Judge for the Eastern District of Virginia, sitting by designation.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Dwight L. Bailey, M.D. ("Dr. Bailey") and Appalachian Emergency Physicians ("AEP") (collectively, "Appellants") appeal from a $2.75 million jury verdict in favor of Karen Taylor Bagheri ("Appellee") in a medical malpractice action involving death. On appeal, Appellants argue, among other issues, that the district court erred in denying their motions for mistrial and new trial after several jurors admitted to having seen negative news reports about Dr. Bailey during the trial and after Appellee introduced evidence that Dr. Bailey's medical license had been suspended.

We conclude that the district court did not abuse its discretion in denying Appellants' motions because it correctly applied the relevant law and took corrective measures to mitigate any prejudice. Further, the record lacks evidence that either the news reports about the trial or the testimony about Dr. Bailey's license suspension influenced the verdict.

## I.

### A.

The decedent presented to the emergency room at a Virginia hospital on June 7, 2013, complaining of chest and back pain, shortness of breath, and other symptoms. He also had a "red toe that was ... draining." J.A. 879.[1] As the emergency room physician on duty, Dr. Bailey examined the decedent and conducted a series of diagnostic tests. One such test Dr. Bailey ordered was a CT scan. However, at 460 pounds, the decedent was too heavy for the hospital's CT machine. Dr. Bailey ultimately concluded that the decedent's symptoms were caused by acute bronchitis and a foot infection. Upon discharging the decedent, Dr. Bailey verbally instructed the decedent to seek a CT scan if he did not feel better.

Five days later, on June 12, 2013, the decedent and his family moved from Virginia to Idaho, a cross-country trip that last-

---

1. Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

ed four days. Although the decedent's cough persisted during the drive and after the family arrived in Idaho, the decedent seemed to be feeling better and was not in pain.

On June 24, 2013—17 days after he presented to the emergency room in Virginia—the decedent's cough suddenly worsened, and "he started coughing so hard that he passed out." J.A. 628. However, the decedent did not go to the hospital that night. The next morning, he began to suffer from shortness of breath, and his wife called an ambulance. The decedent stopped breathing entirely and went into cardiac arrest around the time the ambulance arrived at the hospital. Efforts to resuscitate him were unsuccessful, and he was pronounced dead shortly after his arrival at the hospital. An autopsy concluded that a pulmonary artery thromboembolism [2] caused the decedent's death.

Appellee, the mother of the decedent and the administrator of his estate, filed a medical malpractice action against Appellants on October 28, 2014, alleging that Dr. Bailey failed to diagnose a pulmonary embolism that resulted in the decedent's death. The case eventually went to trial, which began on Wednesday, December 2, 2015. The trial lasted four days.

## B.

During jury selection, outside the presence of the other members of the venire, the court individually questioned several potential jurors who indicated that they had heard of Dr. Bailey. Some of these venire members expressed that they knew Dr. Bailey had previously been accused of overprescribing opioids to his patients.

Prior to the start of the third day of trial, Appellants' counsel informed the district court that several local television stations had run a story about the trial and Dr. Bailey, and one of those stations had posted an article about Dr. Bailey on Facebook. These news reports stated,

A civil trial has begun against a Russell County doctor accused of malpractice. The estate of Shawn Matthew McKee is suing Dr. Dwight Bailey and two other defendants for $3 million. McKee died while under Bailey's care; one of five patients over a period of six years. Last year, the Virginia Department of Health suspended Bailey's license to practice medicine for two years, finding Bailey prescribed large amounts of opiate drugs to several patients with drug-seeking behavior. Bailey and his co-defendants have denied any negligence in the treatment of McKee.

J.A. 992. The Facebook post also included a headline reading, "Va. doctor on trial for deadly malpractice involving drugs." *Id.* at 993.

The television news stories aired on several local stations' 5:00 p.m. and 6:00 p.m. newscasts on Thursday, December 3, 2015, and the Facebook article was posted around the same time. After seeing the news reports, Appellants' counsel contacted at least one television station to correct the false statement that the trial involved drugs and to remove prejudicial facts from the stories. As a result, an updated version of the Facebook article was posted later that night, and the updated story ran on the 11:00 p.m. newscast on December 3 as well as on the next morning's newscast.

On the afternoon of Friday, December 4, 2015, after allowing Appellants' counsel time to obtain copies of the news reports,

---

**2.** A pulmonary artery thromboembolism is a blood clot located in the lungs. *See* J.A. 552, 694.

the district court asked the jurors if any of them had been exposed to the reports. Four jurors indicated that they had. The district court then excused the jury to the jury room and individually questioned each of the four identified jurors about what they had been exposed to and whether it would affect their fairness and impartiality. Two jurors stated that they were "in the other room" when the television mentioned Dr. Bailey, and one of those jurors heard a statement about an amount of money sought in the trial. *See* J.A. 912, 915. A third juror stated that he saw the story "on the news" the previous evening and that it "mentioned the names, and . . . said it was over, like an overdose, or something like that." *Id.* at 917. This juror called the news story "pretty much gossip" and said that "[i]t wasn't anything we were doing here today." *Id.*

Only one juror saw the Facebook post. That juror explained that he was "scrolling down Facebook" when he saw "Dr. Bailey's picture . . . , and [he] clicked it." J.A. 913. He stated that the story "was stuff not even about this case" and "was something about [Dr. Bailey] over medicating, or something." *Id.* at 913–14. This juror further stated that he told the other jurors about seeing the Facebook post but did not go into detail about its contents. A fifth juror heard another juror say that his wife told him "[t]hat the case was about over medicating somebody, and that the amount being sued for was around $3,000,000, [but] he put that off to reporters getting everything wrong." *Id.* at 921. Most importantly, each of these five jurors assured the district court that any information he or she heard had no effect on his or her ability to be fair and impartial and had not influenced his or her perception of the case.

Appellants moved for mistrial on the basis of the news reports and Facebook post, arguing that the information had prejudiced the jury. The district court denied the motion. In concluding that there was no "reasonable possibility or probability" that the jury was influenced by the news reports, the district court determined that the jurors' exposure was "brief and inconsequential" and that the jurors understood "what this case is about, which doesn't have anything to do with drugs." J.A. 926, 929. The jury returned to the courtroom, and the district court instructed the jurors to put the news reports "out of [their] mind[s]." *Id.* at 931.

When trial resumed shortly afterward, Appellee's counsel asked Dr. Bailey on cross-examination if his "license ha[d] been suspended" and if Dr. Bailey "agreed to have [his] license suspended." J.A. 940. Appellants' counsel objected to this line of questioning, and the district court overruled the objection. After the jury had been excused for the day, the district court asked Appellee's counsel about the "relevance" of the license suspension testimony and expressed concern that it was raised without advance warning to the court or to opposing counsel. Appellee's counsel argued that the questioning was appropriate because Appellants presented Dr. Bailey as an expert witness on the issue of the standard of care.

Appellants' counsel moved for mistrial, which the district court ultimately denied on the next trial day, Monday, December 7, 2015. However, the district court concluded that the questioning regarding Dr. Bailey's suspended license was "unfairly prejudicial" because "the license suspension had [nothing] to do with the issues of malpractice asserted in this case." J.A. 1010. In this regard, when the jury entered the courtroom that morning, the district court explained to the jury that it "made a mistake" in overruling the objection by Appellants' counsel and instructed the jury to "completely disregard that evi-

dence, and not consider it or even discuss it in [the] deliberations." *Id.* at 1013.

The jury eventually returned a verdict of $2.75 million in favor of Appellee. Appellants filed a motion for new trial, arguing that the jury was influenced by the negative news reports and the evidence that Dr. Bailey's medical license was suspended, among other issues. The district court denied the motion, holding that "the jury was not prejudiced by the news reports," J.A. 1527, and that the curative instruction as to the license suspension issue "negated the information's effect," *id.* at 1536. Appellants timely appealed.

## II.

In general, we review the district court's denial of a motion for mistrial or new trial for abuse of discretion. *See United States v. Johnson*, 587 F.3d 625, 631 (4th Cir. 2009) (mistrial); *United States v. Basham*, 561 F.3d 302, 319 (4th Cir. 2009) (new trial). "[I]n cases involving possible improper communication with jurors, ... we apply a 'somewhat narrowed' modified abuse of discretion standard that grants us 'more latitude to review the trial court's conclusion in this context than in other situations.'" *Basham*, 561 F.3d at 319 (quoting *United States v. Cheek*, 94 F.3d 136, 140 (4th Cir. 1996)).

The district court abuses its discretion "when its conclusion is 'guided by erroneous legal principles' or 'rests upon a clearly erroneous factual finding.'" *In re Jemsek Clinic, P.A.*, 850 F.3d 150, 156 (4th Cir. 2017) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999)). Further, the district court may not "act[ ] arbitrarily, as if neither by rule nor discretion" or "fail[ ] to adequately take into account judicially recognized factors constraining its exercise of discretion." *United States v. Alvarado*, 840 F.3d 184, 189 (4th Cir. 2016) (alterations and internal

quotation marks omitted). A new trial is warranted "only if the verdict: (1) is against the clear weight of the evidence; (2) is based upon false evidence; or (3) will result in a miscarriage of justice." *EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 145 (4th Cir. 2017).

## III.

## A.

### Jury Exposure to News Reports

#### 1.

Appellants argue that the district court erred in denying their motions for mistrial and new trial after several jurors were exposed to prejudicial news reports about Dr. Bailey during trial. When "prejudicial publicity is brought to the court's attention during a trial," the district court must first determine if any jurors were exposed to that publicity and then examine each juror "individually and outside the presence of the other jurors, to determine the effect of the publicity." *United States v. Hankish*, 502 F.2d 71, 77 (4th Cir. 1974) (quoting *Margoles v. United States*, 407 F.2d 727, 735 (7th Cir. 1969)). The district court must then, "in its sound discretion, take appropriate measures to assure a fair trial," such as "cautionary instructions, excusing individual jurors when alternates are available, or a mistrial if nothing else will cure the prejudice." *Id.* (footnotes omitted). In this case, the district court followed these procedures and gave a cautionary instruction to the jury, charging the jurors to "put [the news reports] out of [their] mind[s]." J.A. 931. We presume that the jury followed such an instruction where, as here, there is "no reason to believe that the jury ... ignored the curative instruction or otherwise was confused." *EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 146 (4th Cir. 2017). Thus, under

*Hankish*, the district court here did all that was required of it.

## 2.

Nonetheless, Appellant contends that the news reports should be deemed presumptively prejudicial pursuant to *Remmer v. United States (Remmer I )*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), *reh'g granted*, 348 U.S. 904, 75 S.Ct. 288, 99 L.Ed. 710 (1955). In *Remmer I*, the Supreme Court held that "any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury" merits a presumption of prejudice if it is "not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties." 347 U.S. at 229, 74 S.Ct. 450. The *Remmer* presumption applies when "the party attacking the verdict" demonstrates that "extrajudicial communications or contacts [between a juror and a third party] were more than innocuous interventions." *Barnes v. Joyner*, 751 F.3d 229, 245 (4th Cir. 2014) (quoting *United States v. Cheek*, 94 F.3d 136, 141 (4th Cir. 1996)). Significantly, "not every allegation of an unauthorized communication between a juror and a third party will trigger" the presumption. *Id.* at 244.

Appellee argues that the *Remmer* presumption does not apply to juror exposure to public communications such as news reports. But we need not reach the issue because Appellant's arguments fail even if we apply the *Remmer* presumption in this case.[3] Upon application, "[t]he burden ... shifts to the prevailing party to prove that there exists no reasonable possibility that the jury's verdict was influenced by an improper communication." *Cheek*, 94 F.3d at 141 (internal quotation marks omitted). In determining whether such a possibility exists, the district court is to consider the extent of the improper communication; the extent to which the communication was discussed and considered by the jury; the type of information communicated; the timing of the exposure; and the strength of the opposing party's case. *See United States v. Basham*, 561 F.3d 302, 320 (4th Cir. 2009). Of these, the extent of the communication is "the most important factor." *Id.*

The district court properly considered these factors here. It determined that the jurors' exposure to the news reports was "brief and inconsequential." J.A. 929. Indeed, the jurors' combined exposure lasted, at most, several minutes. One juror saw the entire 20-to-30-second news clip on television, and two others heard parts of the segment from another room in their homes. Only one juror "took an affirmative step" to intentionally read the Facebook post about the trial. *Id.* at 1527. The district court referred to this juror's conduct as "a momentary lapse in judgment" but determined that the juror "had not been prejudiced" by the information. *Id.* at 1528. Notably, Appellants did not request that this juror, or any of the others, be removed from the panel due to their exposure to the news reports.

Moreover, after questioning each juror individually about what he or she heard or saw, the district court concluded that the jurors "believe[d] that the TV station just got it wrong" and that they understood the case "doesn't have anything to do with drugs." J.A. 929. The jurors' brief exposure to the news reports gave them very

---

**3.** The district court applied the presumption "out of an abundance of caution" and reached the same result. *See* J.A. 1525.

little opportunity to glean any prejudicial information, and no juror indicated that he or she learned from the news reports that Dr. Bailey's medical license had been suspended. Most importantly, the district court "d[id] not believe that anything [the jurors] saw or heard influenced them such that they would be incapable of rendering a fair and impartial verdict in the case." *Id.* To emphasize that the jurors were not to further consider the news reports, the district court also told the jurors that the reports did not "ha[ve] any relation to this case" and instructed them to "put [anything they had seen or heard] out of [their] mind[s]." *Id.* at 931.[4]

### 3.

On the whole, the record demonstrates that the district court took the issue of improper influence seriously. Appellants were permitted to collect the news reports and provide copies to the district court before the district court raised the issue with the jury. The district court asked each juror who was exposed to the news reports about what he or she read or heard and whether that would affect his or her perception of the case. The jurors indicated that they believed the story was not related to the trial and that they understood not to consider the information. The district court, which was in the best position to observe the jurors' demeanor and evaluate their credibility, determined that the jurors did not "draw any [prejudicial] conclusions" from the news reports. J.A. 1526. Nothing about the district court's process or its ultimate conclusion suggests an abuse of discretion. It employed the *Remmer* presumption despite

doubts about the applicability of the *Remmer* presumption to public communications, conducted the required evidentiary hearing, and determined that there was no reasonable possibility that the news reports improperly influenced the jury. Even under the "narrowed" abuse of discretion standard we must apply here, there are no grounds for reversal.

### B.

### Cross-Examination Regarding License Suspension

■ Appellants contend that the district court erred in denying their motions for mistrial and new trial after Appellee introduced evidence at trial that Dr. Bailey's medical license had been suspended. According to Appellants, the probative value of this line of questioning was substantially outweighed by its prejudice to Dr. Bailey. In addition, Appellants emphasize that the questioning violated an agreement between the parties, not to mention in the presence of the jury, that Dr. Bailey's license had been suspended.

### 1.

The district court initially overruled Appellants' objection but ultimately determined that the testimony about Dr. Bailey's license suspension was unfairly prejudicial because the reason for the suspension was unrelated to the case. The district court has "broad discretion" to make this determination, and we see no reason to disturb the district court's decision to ultimately exclude the evidence. *See Minter v. Wells Fargo Bank,*

---

4. Additionally, at least one of the jurors who was exposed to the news reports already knew that Dr. Bailey had previously been accused of overprescribing opioids to his patients. Juror Kilgore was among the potential jurors who stated during jury selection that they had heard of Dr. Bailey and his alleged over-prescription of opioids. Yet, neither party moved to have Juror Kilgore excluded for cause as a result of the fact that he knew this information.

*N.A.*, 762 F.3d 339, 349 (4th Cir. 2014) ("Under Federal Rule of Evidence 403, determining whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice, misleading the jury, or confusion of the issues is within the district court's broad discretion.").

### 2.

The parties agreed prior to trial that Appellee would "not seek to inform the jury that Dr. Bailey [wa]s ... not licensed to practice medicine unless [Appellants] introduce[d] evidence which ma[de] Dr. Bailey's lack of a license relevant." J.A. 1280. Then, during trial, when they called Dr. Bailey as an expert witness as to the standard of care in a medical malpractice action,[5] Appellants made this issue relevant. Appellants asked Dr. Bailey if he "believe[d] that [his] care and treatment of [the decedent] met the standard of care" and asked him to explain why he believed the standard of care had been met. *Id.* at 903.

Under Virginia law, a standard of care witness in a medical malpractice action who is not licensed by the state at the time of trial must have "had active clinical practice ... within one year of the date of the alleged act or omission forming the basis of the action" to be qualified to testify as to the applicable standard of care. *See* Va. Code Ann. § 8.01-581.20 (2015). Dr. Bailey technically met this requirement. However, the fact that Dr. Bailey was not licensed at the time of trial is clearly relevant to the credibility of his testimony that

he "believe[d]"—at the time of trial—that he satisfied the standard of care when he treated the decedent. Therefore, Appellee was well within the realm of reasonableness to ask Dr. Bailey about the suspension of his license.

### 3.

Further, the district court took sufficient measures to mitigate the possibility that the jury would be influenced by the evidence. At the earliest opportunity after determining that it should have sustained Appellants' objection to the questioning, the district court explained that it "made a mistake" and instructed the jury to "completely disregard that evidence, and not consider it or even discuss it in [the] deliberations" because it "ha[d] nothing at all to do with this case, or with the treatment of [the decedent] by Dr. Bailey." J.A. 1013. We see no inherent prejudice to Appellants in the fact that the district court modified its ruling admitting the testimony after a weekend recess, and the delay in providing the curative instruction does not in itself indicate abuse of discretion. *See United States v. Wallace*, 515 F.3d 327, 331 (4th Cir. 2008). The district court, which "was in the best position to assess" the impact of the evidence on the jury, concluded that the curative instruction it gave was sufficient. *See Arizona v. Washington*, 434 U.S. 497, 514–15, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978).

Moreover, Appellants were permitted to present an additional expert witness to testify as to the standard of care. Under

---

**5.** There is some question as to whether Dr. Bailey was properly designated to testify on this subject in the first place. Appellants' initial expert disclosures state that Dr. Bailey would testify "to the subject matters of causation, damages, and his care and treatment of [the decedent]." J.A. 1281–82. To the extent that the standard of care may be subsumed within "care and treatment," Appellants technically designated Dr. Bailey as a standard of care expert. However, the fact that there was some confusion at trial as to the extent of Dr. Bailey's expert testimony suggests that Appellants' language should have been clearer if in fact they intended to designate Dr. Bailey as a standard of care expert from the outset.

**150**

these circumstances, the district court did not abuse its discretion by initially overruling Appellants' objection to the line of questioning about the suspension of Dr. Bailey's medical license.

## C.

The remaining issues raised by Appellant likewise do not warrant granting a new trial.

### 1.

#### Exclusion of Testimony Regarding Dr. Bailey's Discharge Instructions

█ The district court took great care to avoid the presentation of evidence that would create an inference of contributory negligence on the part of the decedent, given that Appellants were barred from asserting this defense. *See Chandler v. Graffeo*, 268 Va. 673, 604 S.E.2d 1, 5 (2004) ("To constitute contributory negligence in a medical-malpractice case [pursuant to Virginia law], a plaintiff's negligence must be contemporaneous with the claimed defendant's negligence."). The district court held prior to trial that there was no evidence of contemporaneous negligence on the part of the decedent, and Appellants do not challenge that ruling on appeal. On this basis, the district court properly excluded evidence that the decedent's wife told the emergency room physician at the hospital in Idaho that Dr. Bailey instructed the decedent to obtain a CT scan if he did not feel better.

To the extent that this evidence supported Appellants' assertion that a CT scan was unnecessary because the decedent improved with treatment, this argument was presented at trial. Dr. Bailey testified about his discharge instructions, and several other witnesses testified that the decedent did feel better in the days leading up to his death. Additional testimony on this point from the decedent's wife was therefore unnecessary, and it is un-

likely that its exclusion prejudiced Appellants.

### 2.

#### Jury Instruction Regarding "Duty" to Arrange CT Scan

█ We also find no abuse of discretion in the district court's jury instruction "that after seeing Dr. Bailey, [the decedent] had no duty to arrange his own CT scan." J.A. 1127. The district court apparently thought it necessary to give this instruction in order to prevent an inference of contributory negligence because it was "not an issue in this case" and there was "no evidence supporting" it. *Id.* at 1084. "[W]e accord the district court much discretion to fashion the charge." *Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011) (internal quotation marks omitted). Even if the district court could have framed the instruction differently, there is nothing in the record to indicate that its failure to do so "seriously impaired [Appellants'] ability to conduct [their] defense." *United States v. Passaro*, 577 F.3d 207, 221 (4th Cir. 2009) (describing standard for "reversible error in refusing to provide a proffered jury instruction"). Appellants argued at trial that a CT scan was entirely unnecessary because the decedent's condition improved with the treatment Dr. Bailey prescribed. By contrast, Appellee's expert witnesses testified that a CT scan was required despite any later improvement. The jury was entitled to believe either standard of care theory. In this light, giving the instruction as Appellants requested—or not giving it at all—would have no bearing on the evidence Appellants presented at trial.

### 3.

#### Jury Instruction Regarding "Corroboration" of Dr. Bailey's Testimony

█ For similar reasons, we find no reversible error in the district court's in-

struction that "[t]here can be no verdict against the plaintiff based on the uncorroborated testimony of Dr. Bailey." J.A. 1127. The jury instructions are deemed sufficient if "construed as a whole, [they] properly informed the jury of the controlling legal principles without misleading or confusing the jury." *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 775 (4th Cir. 1997). The district court's instruction with regard to the uncorroborated testimony of Dr. Bailey was an accurate statement of Virginia law. *See* Va. Code Ann. § 8.01-397 (2015) (providing that "[i]n an action by or against any person who ... is incapable of testifying, ... no judgment ... shall be rendered in favor of an adverse or interested party founded on his uncorroborated testimony"). Moreover, any resulting prejudice to Appellants is minimal because there is nothing to indicate that the jury disregarded any of Dr. Bailey's testimony for lack of corroboration.

### 4.

### Damages

Finally, we find no error in admitting the damages calculation performed by Appellee's damages expert. To calculate the decedent's personal consumption of his expected income for the remainder of his lifetime, Appellee's expert used information about the decedent's income, family size, and the number and ages of the children in the household, as well as statistical rates corresponding to this data. To determine the value of the household services performed by the decedent, the expert spoke with the decedent's wife about the kinds of activities the decedent performed in the household and the amount of time per week the decedent spent doing these tasks. The expert then multiplied the amount of time spent by the national average hourly rate for such services.

Appellants assert that the expert "inflated" the overall damages calculation by failing to include facts related to the decedent's financial situation and by relying on national statistical data not tailored to the decedent personally. However, the expert employed an "accepted method" of determining an individual's projected consumption by applying facts specific to the decedent and his family to the statistical data. *See* J.A. 170. He also explained that he used a national rate to determine the value of the decedent's household services rather than a local rate because the decedent lived in "two places ... almost completely across the country," and because the rate included "a variety of jobs." *Id.* at 679. Absent some other indication that the expert's methodology was unreliable, it cannot be said that the district court abused its discretion in permitting the expert to testify as to this calculation. *See United States v. Wilson*, 484 F.3d 267, 273–74 (4th Cir. 2007) (stating that "the test of reliability is flexible" and discussing district court's discretion in determining whether expert testimony is reliable).

### IV.

For the foregoing reasons, the order of the district court is

*AFFIRMED.*